## LEOVY v. UNITED STATES.

(Circuit Court of Appeals, Fifth Circuit. February 28, 1899.)

No. 745.

1. NAVIGABLE WATERS—OBSTRUCTION—PROSECUTION—EVIDENCE.
    In a prosecution for the erection of a dam in a navigable stream without consent of the secretary of war, prohibited by 27 Stat. 110, c. 158, § 3, a resolution of state levee commissioners within the district in which the dam was built, approving defendant's action, passed after indictment found, was irrelevant.

2. SAME—QUESTION FOR JURY.
    Where evidence of the character of a stream is conflicting, whether it is a navigable stream, within 27 Stat. 110, c. 158, § 3, prohibiting the erection of any dam, etc., in navigable streams of the United States, is a question of law and fact, for the jury.

**3. Same—Navigable Rivers—Outbreak—State's Right to Close.**

That an outlet of the Mississippi river resulted from a break or crevasse in the natural channel does not warrant its closing by the state or local authorities without consent of the United States, where it has been open and navigable for over 60 years, and during such time has been a commercial highway.

**4. Same—Police Power.**

A state has no authority, under its police power, to close any navigable water of the United States, though located wholly within the limits of the state, for the purpose of reclamation of swamp lands, without the consent of the federal government.

**5. Same—Instructions.**

Where defendant was charged with obstructing a navigable stream, prohibited by 27 Stat. 110, c. 158, § 3, an instruction that unless such stream, when closed, was substantially useful for interstate commerce, the federal legislation prohibiting its closing was unconstitutional, was properly refused, as inapplicable to the issues.

**6. Same—Navigable Waters—Definition.**

In a prosecution under 27 Stat. 110, c. 158, § 3, prohibiting the obstruction of any navigable water of the United States, a charge defining a "navigable water" as such as, of itself or in connection with other water, permits a continuous journey by boat, by one of the principal methods of commerce, from one state to another, was correct.

**7. Same—Federal Control—Constitutional Powers—State Rights.**

The power vested in the federal government by Const. art. 1, § 8, to regulate interstate commerce, etc., involves the control of waters of the United States which are navigable in fact, so far as to insure their free navigation; and hence a state has no power to close any such navigable waters, though located wholly within its limits.

**8. Same—Statutes—Construction—Penalty.**

The rivers and harbors act of September 19, 1890 (26 Stat. 426, 454, c. 907, § 7), prohibits the erection of obstructions in navigable waters of the United States; and section 10 provides that every person guilty of a violation of the provisions of section 7 shall be punished by fine or imprisonment, or both. By Act 1892 (27 Stat. 88, 110, c. 158) section 7 of the act of 1890 was amended and re-enacted, the amendment, however, relating only to the alteration of ports, harbors, etc., and the balance of the re-enacted section was the same as the original. *Held*, that section 10 applied to section 7 as amended and re-enacted, and imposed a penalty for its violation.

In Error to the Circuit Court of the United States for the Eastern District of Louisiana.

Augustus F. Leovy and Robert S. Leovy were indicted on May 19, 1897, under Act Sept. 19, 1890 (26 Stat. 454), as amended by Act July 13, 1892 (27 Stat. 110, c. 158, § 3).

The indictment charged them with having, on November 16, 1895, and on other days during that month, built a dam across Red Pass, a navigable stream of the United States, in the parish of Plaquemines, La., without permission of the secretary of war, and thus having closed said navigable stream, in violation of said law. Defendants pleaded not guilty, and on trial the jury rendered a verdict finding Augustus F. Leovy not guilty, and finding Robert S. Leovy guilty as charged; and the court sentenced Robert S. Leovy to pay a fine of $200 and costs of prosecution.

Plaintiff in error, Robert S. Leovy, on the trial reserved three bills of exceptions to the rulings of the trial judge, and on this writ presented eleven assignments of error. These exceptions and assignments of error, summarized, are as follows, viz.: Bill No. 1 and assignment No. 1 complain because the trial judge refused to allow the defendants to put in evidence a resolution passed by the Board of Commissioners of Buras Levee District, on November 20, 1897, approving the action of Robert S. Leovy in the dam-

ming and closing of said Red Pass. Bill No. 2 and assignment No. 2 complain because the trial judge refused to instruct the jury to acquit the defendants. Bill No. 3 and assignments Nos. 3, 4, 5, 6, 7, 8, 9, and 10 embrace the following complaints, viz.: "(a) Because the trial judge refused to instruct the jury that, 'if the jury shall find that Red Pass is not a natural stream, but simply the result of a crevasse or outbreak of the Mississippi river from its natural channel, they must acquit the defendants.' (b) Because the court refused to charge the jury that, 'if the jury shall find that Red Pass was a crevasse or outbreak of the Mississippi river from its natural channel, the result of which was to overflow a large portion of Plaquemines parish, to the detriment of the inhabitants thereof by the destruction of their property and prejudicial to their health, the state, in the exercise of its police power, delegated to the police jury of the parish of Plaquemines, had a right to close it.' (c) Because the trial judge refused to instruct the jury that, 'if the jury shall find that Red Pass is a crevasse or outbreak of the Mississippi river from its natural channel, and overflows the lands situated on the banks of Red Pass, and that its closing was necessary to reclaim, drain, or levee said lands, or any of them, then it was the duty of the state, under the acts of congress of 1849 and 1850, to close Red Pass.' (d) Because the court refused to charge that 'unless the jury shall be satisfied, from the evidence, that Red Pass was, at the time when it was closed, as alleged in the indictment, substantially useful to some purpose of interstate commerce, the jury are instructed that any federal legislation purporting to prohibit or prevent or interfere with the closing of said stream would be beyond the powers granted to the congress of the United States by article 1, § 9, of the constitution, or otherwise vested by the constitution of the United States in congress, and would be contrary to amendment 10 of the constitution of the United States; and the jury are instructed that the defendants, claiming and being entitled to the protection of that constitution, must be acquitted.' (e) Because the court refused to request and charge the jury that, 'if the jury shall find that the dam constructed at the mouth of Red Pass was constructed by authority of the police jury of the parish of Plaquemines, and that the defendant Robert S. Leovy was an officer of said parish, and in constructing said dam was acting as such under authority of the police jury thereof, they must acquit him.' (f) Certain portions of the general charge are also objected to, viz.: 'I wish, also, to say that the question whether, some 60 years ago, the Jump resulted from the enlargement of some canal which was then in existence, or, as has been contended here, was a "crevasse," in that sense of the word, you are not to consider at all. As you have been appealed to in the argument to consider that this question involved the right of the state to close a gap in its levees, I say that you have nothing of that sort to consider. I repeat to you that whether or not, 63 years ago, the Jump was formed in the manner in which it was contended it was, is not a matter for your consideration.' 'I charge you, gentlemen, that the police jury of the parish had no right to authorize Mr. Robert S. Leovy to dam Red Pass, if Red Pass was a navigable water of the United States. I say that it had no authority, because, in the year 1890, the congress of the United States passed the law under which this indictment has been brought, forbidding the damming of any navigable stream of the United States without the previous authorization of the secretary of war. Therefore, as it was not contended in this case that there was any authority from the secretary, but, on the contrary, there is proof tending to show there was no such authority, then it results that it is no defense for Mr. Robert S. Leovy to show his pretended or alleged authority from the police jury of the parish of Plaquemines. The police jury of the parish of Plaquemines could not lawfully have dammed it. Therefore Mr. Leovy could not.' 'What is a navigable water of the United States? It is a navigable water which, either of itself or in connection with other water, permits a continuous journey to another state. If a stream is navigable, and from that stream you can make a journey by water, by boat, by one of the principal methods used in ordinary commerce, to another state from the state in which you start on that journey, then it is a navigable water of the United States. It is so called, in contradistinction to waters which arise and come to an end within the boundaries of

the state. * * * But if, from the water in one state, you can travel by water continuously to another state, and the water is a navigable water, then it is a navigable stream of the United States. * * * If it was navigable, and connected with waters that permitted a journey to another state, then it is a navigable water of the United States. In this case, if it was navigable, it would be a navigable water of the United States, or might be so, in two ways: By connecting with the waters of the Gulf, if you should find it connected that way; or by connecting with the waters of the Mississippi. I mean to say that, if there is evidence here that you could leave the Mississippi, and go into the Jump, and then go to the place where this dam was built by Robert S. Leovy, and some distance beyond that, and that it was navigable for boats or vessels carrying on commerce, then it would be a navigable water of the United States, because it would connect with the Mississippi, and from the Mississippi you could go to the other states of the Union. I say, again, that it might connect in another way. It might connect through the Gulf. But the fact that I wish to impress upon you is this: That it is not absolutely necessary that you should find that there was navigability all the way from the Jump out to the Gulf, because, if, from some point beyond the place where Mr. Robert S. Leovy built this dam towards the Mississippi river, the stream was navigable, then it would be a navigable stream of the United States, because it would connect with the Mississippi river.'" The eleventh assignment of error complains about the sentence and judgment, because it is averred "there was no penalty imposed by law for the offense charged."

Henry J. Leovy, John D. Rouse, and Wm. Grant, for plaintiff in error.

J. Ward Gurley, for the United States.

Before PARDEE and McCORMICK, Circuit Judges, and SWAYNE, District Judge.

After stating the case as above, the opinion of the court was delivered by PARDEE, Circuit Judge.

The first assignment of error, based upon the first bill of exceptions, complains of the refusal of the court to permit to be read in evidence on the trial a certified copy of a resolution passed by the Board of Commissioners of Buras Levee District, at a meeting thereof held on the 20th of November, 1897, said Board of Commissioners of Buras Levee District being a body corporate under the laws of Louisiana, whose duties and powers are defined by law. The bill of exceptions does not recite any facts proved or offered to be proved, nor any other matter, tending to show whether the resolution offered was relevant or irrelevant; and, standing by itself, the bill presents a purely abstract question. It is true that, in another bill of exceptions, all the evidence admitted and offered in the case is recited; but it is not the duty of the court to go through the whole body of evidence to find a state of facts which would make the resolution offered pertinent to some issue in the case. As a matter of fact, however, the resolution offered was one passed by the board of commissioners after the indictment found, and it was wholly irrelevant to any issue presented before the jury.

The second assignment of error is based on a bill of exceptions which contains all the evidence taken and offered on the trial of the case, and the complaint is that, upon consideration of the whole evidence adduced, the court erred in refusing to direct the jury to acquit

the defendants.    Whether or not Red Pass was a navigable stream,
within the meaning of the rivers and harbors act of September 19,
1890, and the amendments of section 7 of the act of July 13, 1892, is a
question of law and fact, and the evidence submitted thereon was con-
flicting.    The question was properly left to the jury under the in-
structions of the court.

The third assignment of error complains of the refusal of the court
to instruct the jury that, if they should find that Red Pass was not
a natural stream, but simply the result of a crevasse or outbreak of
the Mississippi river from its natural channel, they must acquit the
defendants.    The proposition of law involved, even if correct in prin-
ciple, is too general in terms, and the effect of it, under the evidence,
which tended to show that over 60 years ago there was a crevasse or
outbreak in the Mississippi river at the Jump, resulting in the forma-
tion of Red Pass, which might have been, and probably was, a naviga-
ble stream from that date, would have been to confuse and embarrass
the jury.

We notice that the eighth assignment of error complains of a part
of the charge given to the jury as follows:

"I wish, also, to say that the question whether, some 60 years ago, the
Jump resulted from the enlargement of some canal which was then in
existence, or, as has been contended here, was a 'crevasse,' in that sense
of the word, you are not to consider at all.    As you have been appealed to
in the argument to consider that this question involved the right of the state
to close a gap in its levees, I say that you have nothing of that sort to
consider.    I repeat to you that whether or not, 60 years ago, the Jump was
formed in the manner in which it was contended it was, is not a matter for
your consideration."

From our examination of the whole evidence brought up in the rec-
ord, and the whole charge as given, we are of opinion that this in-
struction was correct and proper; no such case having been made as
would warrant the jury to consider whether or not Red Pass was the
result of a crevasse.    At the same time, it is proper to say that a
recent crevasse in the levee on the bank of the Mississippi river or
other navigable stream may be closed by the state or local authority,
although, while open, it may be navigable; but it does not follow
that an outlet of the Mississippi river, near its mouth, resulting from
an outbreak of the natural channel over 60 years ago, and which be-
came navigable long before the United States ceded the swamp lands
to the state of Louisiana for drainage purposes, and which has since
been a highway for commerce, may now be closed by either the state
or local authorities, without the consent of the United States.    This
disposes of the third and eighth assignments of error.

The fourth assignment of error raises the question whether the
court ought to have instructed the jury, on request, that the police
jury of the parish of Plaquemines had the right to close Red Pass, in
the exercise of the police power of the state, delegated to said police
jury.    There is no legitimate evidence in the record tending to show
that the police jury of the parish of Plaquemines ordered Red Pass
closed for the purpose of effecting or promoting the peace, morals,
education, health, or good order of the people; but the case does show
that the pass was ordered closed, and was closed, for the sole pur-

pose of reclaiming swamp lands. Under the power to regulate commerce, congress having forbidden the closing of any navigable water without the consent of the United States, it is very doubtful whether any navigable water of the United States, although wholly within the limits of the state, can be closed, under the exercise of the police power of the state, for any purpose whatever; but, where the purpose only is the reclamation of swamp lands, there is no doubt the police power of the state must give way to the authority of congress. Railway Co. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, is an interesting case on this subject, and we quote from page 104, 158 U. S., and page 804, 15 Sup. Ct., as follows:

"Generally it may be said, in respect to laws of this character, that, though resting upon the police power of the state, they must yield whenever congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter; for that power, like all other reserved powers of the states, is subordinate to those in terms conferred by the constitution upon the nation. 'No urgency for its use can authorize a state to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of congress by the constitution.' Henderson v. New York. 92 U. S. 259, 271. 'Definitions of the police power must, however, be taken subject to the condition that the state cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government, or rights granted or secured by the supreme law of the land.' New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 661, 6 Sup. Ct. 252. 'While it may be a police power, in the sense that all provisions for the health, comfort, and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, where such powers are so exercised as to come within the domain of federal authority as defined by the constitution, the latter must prevail.' Morgan's Louisiana & T. R. & S. S. Co. v. Louisiana, 118 U. S. 455, 464, 6 Sup. Ct. 1114."

The charge as requested was properly refused, as incorrect in law as well as inapplicable to the case before the jury.

We understand that the seventh and ninth assignments of error were intended to raise this same question as to the right of the police jury of the parish of Plaquemines to close Red Pass, under the police power of the state of Louisiana, irrespective of the statutes of the United States forbidding the closing of navigable streams without the consent of the secretary of war; and for the reasons given as to the fourth assignment, if for no other, the said assignments are without merit.

The fifth assignment of error is not apparently insisted upon, and needs no consideration.

The sixth assignment of error raises the question whether the court erred in refusing the request to instruct the jury as follows:

"Unless the jury shall be satisfied, from the evidence, that Red Pass was, at the time when it was closed, as alleged in the indictment, substantially useful to some purpose of interstate commerce, the jury are instructed that any federal legislation purporting to prohibit or prevent or interfere with the closing of said stream would be beyond the powers granted to the congress by article 1, § 9, of the constitution, or otherwise vested by the constitution of the United States in congress, and would be contrary to amendment 10 of the constitution of the United States; and the jury are instructed that the defendants, claiming and being entitled to the protection of that constitution, must be acquitted."

Section 9, art. 1, of the constitution does not appear to have much bearing on the subject; but the third paragraph of section 8 of article 1 gives congress the power to regulate commerce with foreign nations, among the several states, and with the Indian tribes, and is probably the provision of article 1 which was intended to be referred to. Article 10 of the amendments of the constitution of the United. States is that:

"The powers not delegated to the United States by the constitution, nor prohibited by it to the states, are reserved to the states, respectively, or to the people."

It is well settled that the power to regulate commerce with foreign nations and among the several states comprehends the control for that purpose, and to the extent necessary, of all navigable waters of the United States which are accessible from a state other than those in which they lie. The requested instruction appears to mean that if the jury should not be satisfied, from the evidence, that Red Pass, at the time when it was closed, was a navigable water of the United States, within the proper definitions of the term "navigable water," then any federal legislation purporting to prohibit or prevent or interfere with the closing of said stream, would be beyond the power of congress. If this is what it means, the proposition must be conceded; but its applicability as a separate proposition in the present case is not apparent. The contention of the government was that Red Pass was a navigable stream when the defendants closed it, and it was only on the theory that it was a navigable stream at that time that the defendants could have been convicted at all.

The tenth assignment of error complains of the charge of the judge defining what is a navigable water of the United States. The charge in this respect, as given by the trial judge, seems to be in accord with the decisions of the supreme court of the United States, and we see no error therein. No specific error in the charge given is pointed out, but the plaintiff in error contends that Red Pass was essentially a stream wholly within the state, and wholly within the jurisdiction of the state, and therefore the state had the authority to close the same without the consent of the government of the United States.

"The power vested in the general government to regulate interstate and foreign commerce involves the control of the waters of the United States which are navigable in fact, so far as may be necessary to insure their free navigation, when, by themselves or their connection with other waters, they have a continuous channel for commerce among the states or with foreign countries." The Daniel Ball, 10 Wall. 557.

The above proposition was reiterated in Escanaba & L. M. Transp. Co. v. City of Chicago, 107 U. S. 678, 2 Sup. Ct. 185, in which case it was held that the Chicago river and its branches, although wholly within the state of Illinois, must be deemed navigable waters of the United States, over which congress, under its commercial power, must exercise control to the extent necessary to protect, preserve, and improve their free navigation. Escanaba & L. M. Transp. Co. v. City of Chicago has been frequently recognized and approved by the supreme court, and it is wholly inconsistent with the proposition that any state may close up a navigable water of the United States, with-

out the consent of the United States, although such navigable water may be wholly within the limits of such state.

In the rivers and harbors act approved September 19, 1890 (26 Stat. 426, 454, c. 907), it is provided (in section 7) as follows:

"That it shall not be lawful to build any wharf, pier, dolphin, boom, dam weir, breakwater, bulkhead, jetty or structure of any kind outside established harbor lines, or in any navigable waters of the United States where no harbor lines are or may be established, without the permission of the secretary of war, in any port, roadstead, haven, harbor, navigable river, or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce or anchorage of said waters, and it shall not be lawful hereafter to commence the construction of any bridge, bridge draw, bridge piers and abutments, causeway or other works over or in any port, road, roadstead, haven, harbor, navigable river, or navigable waters of the United States, under any act of the legislative assembly of any state, until the location and plan of such bridge or other works have been submitted to and approved by the secretary of war, or to excavate or fill, or in any manner to alter or modify the course, location, condition, or capacity of the channel of said navigable water of the United States, unless approved and authorized by the secretary of war: Provided, that this section shall not apply to any bridge, bridge draw, bridge piers and abutments the construction of which has been heretofore duly authorized by law, or be so construed as to authorize the construction of any bridge, draw bridge, bridge piers and abutments, or other works, under an act of the legislature of any state, over or in any stream, port, roadstead, haven or harbor, or other navigable water not wholly within the limits of such state."

### The tenth section of the same act provided as follows:

"Every person and every corporation which shall be guilty of creating or continuing any such unlawful obstruction in this act mentioned, or who shall violate the provisions of the last four preceding sections of this act, shall be deemed guilty of a misdemeanor, and on conviction thereof shall be punished by a fine not exceeding five thousand dollars or by imprisonment (in the case of a natural person) not exceeding one year, or by both such punishments, in the discretion of the court, the creating or continuing of any unlawful obstruction in this act mentioned may be prevented and such obstruction may be caused to be removed by the injunction of any circuit court exercising jurisdiction in any district in which such obstruction may be threatened or may exist; and proper proceedings in equity to this end may be instituted under the direction of the attorney general of the United States."

In the rivers and harbors act of 1892 (27 Stat. 88, 110, c. 158), section 7 of the act of 1890 was amended and re-enacted, so as to read as follows:

"That it shall not be lawful to build any wharf, pier, dolphin, boom, dam weir, breakwater, bulkhead, jetty or structure of any kind outside established harbor lines, or in any navigable waters of the United States where no harbor lines are or may be established, without the permission of the secretary of war, in any port, roadstead, haven, harbor, navigable river, or other waters of the United States, in such manner as shall obstruct or impair navigation, commerce, or anchorage of said waters; and it shall not be lawful hereafter to commence the construction of any bridge, bridge draw, bridge piers and abutments, causeway, or other works over or in any port, road, roadstead, haven, harbor, navigable river or navigable waters of the United States, under any act of the legislative assembly of any state, until the location and plan of such bridge or other works have been submitted to and approved by the secretary of war, or to excavate or fill, or in any manner to alter or modify the course, location, condition or capacity of any port, roadstead, haven, harbor, harbor of refuge, or inclosure within the limits of any breakwater, or of the channel of any navigable water of the United States, unless approved and authorized by the secretary of war: Provided, that this sec-

tion shall not apply to any bridge, bridge draw, bridge piers and abutments the construction of which has been heretofore duly authorized by law, or be so construed as to authorize the construction· of any bridge, bridge draw, bridge piers and abutments or other works under an act of the' legislature of any state, over or in any stream, port, roadstead, haven or harbor or other navigable water not wholly within the limits of such state."

The amendment relates only to altering ports and harbors, etc,, and otherwise the re-enacted section is the same as the original. The intention and effect of the legislation of 1892 was to embody in the act of 1890 the amended and re-enacted section, so that the provisions of section 10 of the act of 1890 should apply to the violation of the amended and re-enacted section, the same as to the violation of section 7 as originally enacted. See Black, Interp. Laws, pp. 356, 357. We therefore conclude that the eleventh assignment of error. is with-out merit.

At the close of the very able and ingenious brief of the learned counsel for the plaintiff in error we find:

"In conclusion, we beg again to remind the court that the issues in this case are not confined to the question of closing Red Pass only. Numerous passes of like character extend through all the swamp lands granted by congress in 1849 and 1850 to Louisiana and other states to be drained and reclaimed; and, if the power be denied to close them, or even if this power be made subject to the arbitrary control of the secretary of war, the reclaiming of millions of acres of land will be rendered impracticable, if not wholly impossible. The theory contended for by the prosecution would, if maintained, revolutionize the entire relation of the federal government to the state levee, quarantine, inspection, and other authorities, and fill the federal courts with the clamors of all those discontented with the administration of police laws. It· would seriously embarrass officials charged with the execution of vitally important measures in times of great public danger through flood and pestilence. Indeed,-it is hardly an exaggeration to say that the police power is the state, embracing, as it does, under the authorities, the prevention of flood and fire, disease and crime, and all other physical and moral evils. No federal statute expressly excepts state officers charged with such duties from criminal punishment for official acts; but, under the authorities, not even the constitutional amendments, much less federal statutes, were meant to subject to indictment for their official and vitally necessary actions the state's quarantine, fire, inspection, police, or levee officials, any more than its officers of justice or the judges of its courts."

We notice this merely to say that, if the picture of evils resulting from maintaining the statute of the United States forbidding the closing of navigable waters is correctly drawn, the remedy lies in congressional, rather than in judicial, legislation. It does not appear to us, however, that the enforcement of the federal statute ought to have any such disastrous and humiliating effects. It is not to be supposed that the secretary of war will refuse his approval to any reasonable closing of swamp outlets and bayous, wholly or partly within a state, whenever the same is necessary, or apparently necessary, to protect the health, morals, or general good of the community interested. It is probable that all that will be necessary will be to apply, showing the apparent need of the work proposed; and such application to the government controlling the navigable waters of the United States may well be made, and without compromise of dignity, by any state officer or board, or even by the state itself.

The judgment of the circuit court is affirmed.