Atkinson, J.,
delivered the opinion of the court:
This is a claim for rent of and damage to a two-story frame hotel building owned by the claimant in the town of Macclenny, Baker County, Fla., by reason of said hotel being used as a yellow-fever hospital in the summer and fall of 1888. The amount claimed in the bill is $10,000. The evidence consists of testimony of the claimant and five witnesses taken at said town of Macclenny in May, 1909, and certified copies of the records of the Treasury Department bearing upon the operation of the Marine-Hospital Service in connection with the epidemic of yellow fever at that place in August, September, and October, 1888.
The findings show that an epidemic of yellow fever broke out in Macclenny in the early part of August, 1888; that the fever was not recognized by local physicians as yellow fever; that after a number of people, including the mayor and other town officials, had been stricken with the disease the acting mayor telegraphed to the Marine-Hospital Service at Washington, requesting that an expert be sent to ascertain if the malady was yellow fever. The second day after the telegram was sent Dr. J. L. Posey, a yellow-fever specialist and expert of the Marine-Hospital Service, arrived at Macclenny. *311 He was met by the claimant and other citizens of the town, made an examination, and stated to the claimant and to others that the town was badly infected with a virulent type of yellow fever, and suggested as a means of preventing it from becoming epidemic, not only throughout the entire town but in the surrounding territory, that a hospital should be secured and those afflicted with the malady, as far as possible, be placed therein.. Claimant’s hotel was the only building in the town large enough for the purpose, and it was agreed to take possession of it, which was accordingly done, and it was quickly filled with fever patients. Doctor Posey left the town the same day he arrived there, and did not again return for perhaps two or three days, then remaining only a short time.
In' the meantime Bed Cross nurses and one or more physicians arrived from Pensacola and New Orleans and assumed control of the situation. By whose authority they were sent does not appear, nor is it anywhere shown that Doctor Posey, the government specialist, at any time during his stay in the town, acted other than in an advisory capacity and as a friendly messenger of the United States Government to aid the local authorities in their efforts to stamp out the disease. On the contrary, it is shown by the letters of the mayor of the town, Dr. Joseph Y. Porter, surgeon in charge of government relief measures in Florida, and by the mayor himself, as shown by Finding VI, that the hotel was taken possession of for a hospital by the town officials and Bed Cross nurses. Hence the charge that Doctor Posey, as an officer of the Government, impressed the hotel building under authority of the United States is not sustained by the findings of fact. It is therefore clear that there can be no liability on the part of the United States for the occupation of the building or for any damage thereto.
It appears from the findings that the principal damage to the hotel property was by reason of the taking down of the heavy paper from the walls on the inside of the building and the burning of furniture, bedding, etc., for purposes of disinfection; that this was done by the Bed Cross authorities or the state board of health, or both, and not by authority *312 of the United States, is clearly shown by the findings. It is reasonable to suppose that the authority which destroyed the furniture and wall paper of the hotel likewise destroyed the furniture of other infected buildings in the town. One witness states that the furniture of his dwelling was destroyed, and others were disposed of in the same manner, and that he was reimbursed for his loss, but he fails to state by whose authority the burning was done or who paid him for his property. It is evident, therefore, that it was not done by authority of the United States, because no government officials were in that vicinity at the time of the destruction, but it was evidently done by the Bed Cross Association or by the county or state boards of health, or by their combined authority.
There is no statute authorizing the seizure by the Public Health and Marine-Hospital Service of private property for use in the suppression of an epidemic, the preservation of the public health being a part of the police power of the States. This is borne out by the whole tenor of the statutory enactments in regard to the Public Health and Marine-Hospital Service, which limit the operations of this service to the “ aid of state or municipal boards of health.”
Section 4792, Bevised Statutes, provides that the quarantines and other restraints established by the health laws of any State respecting vessels arriving and departing from any American ports shall be duly observed by customs officers and the masters and crews of revenue cutters and by the military officers of the United States; and it further provides that all such officers shall aid in the execution of such quarantines and health laws.
Congress has, by the act of 1799 (sec. 4792, Rev. Stat.) and previous laws, and by the act of 1878 (20 Stats., 37), adopted the laws of the States on that subject, and has forbidden all interference with their enforcement. (Morgan's Steamship Co. v. Louisiana, 118 U. S., 455.)
The act of April 29, 1878, supra, prohibits vessels from bringing to the United States from foreign countries any persons, merchandise, or animals affected with any infectious or contagious disease, and authorizes the medical officers of *313 the Marine-Hospital Service to aid in enforcing quarantine regulations, provided, however, that there shall be no interference with state regulations or laws.
The act of February 15,1893 (27 Stats., 449) is an enlargement of previous acts and bears directly upon foreign vessels arriving at American ports, and prescribes the duties of government officials in enforcing quarantine laws for the purpose of preventing the importation of infectious and contagious diseases, but such service is not allowed to conflict with state health laws and regulations.
A joint resolution was adopted by the Congress September 26, 1888 (the year in which occurred the epidemic out of which this claim arose) (25 Stats., 630), which appropriated $200,000 to suppress infection in the interstate commerce of the United States. This resolution provides that said sum shall be “ expended in the discretion of the President of the United States in aid of state or municipal boards of health, or otherwise, by such means as he shall deem best to prevent the introduction of * * * yellow fever into the United States from foreign countries, or into one State or Territory from another.” It will be noticed that this provision, having in mind the commerce clause of the Constitution, limits the operations under it- to interstate or foreign commerce. The unexpended balance of this sum has been made available and additional sums added by nearly every Congress since that time, and always with the provision that it shall be expended by the President in aid of state or local boards of health. (34 Stats., 1905, 1907, p. 709.)
It is clear that this statute did not give the President any power to seize which he did not otherwise possess, but merely appropriated money to be used in aid of state boards of health in the suppression of contagious diseases. Plowever, as far as this case is concerned, it makes no difference whether the Marine-Hospital Service, representing the United States Government, had any authority to seize the building in question or not, since it clearly appears from the findings that no such authority was exercised.
If the United States can be charged with the expenses of an epidemic merely because it, upon the request of *314 a suffering community, dispatched an expert official to the scene of a raging and dangerous disease, believed to possess an infectious or contagious character, it will be difficult to tell what in the end would be the result. If the Government can not lend a kindly, helping hand to its people in the time of distress by sending expert physicians to diagnose malignant diseases, when called upon' so to do, without being held financially responsible for a part or all of the expenses which must necessarily follow epidemic maladies, it would be either financially crippled or must refuse to answer such calls from its citizens.
Inasmuch as the property of the claimant was not taken or destroyed by the direction of the proper authorities of the United States, express or implied, the claim herein is neither a legal nor an equitable one against the Government.
It is ordered that the findings of fact, together with a copy of this opinion, be certified to the Congress.