# J. P. BOURET

*v.*

# JOSE É. BENEDICTO, TREASURER OF PORTO RICO.

San Juan, Equity, No. 1037.

INJUNCTION AGAINST TAXES.

Pleading—Parties.

1. Where a suit is brought against the treasurer of Porto Rico for denying a constitutional right, it is not a suit against the people of Porto Rico.

Equity—Remedy at Law.

2. Inadequacy of legal remedy justifying a resort to equity exists where a suit demands preventive relief such as against multiplicity of suits or irreparable injury. It applies where a merchant in Porto Rico is compelled to pay an excise tax on all consignments brought from the United States.

Constitutional Law—Porto Rico.

3. Porto Rico is an organized territory of the United States inhabited by American citizens who enjoy most of the rights enumerated in the Constitution. Comity extends these to alien friends.

Constitutional Law—Property and Contract.

4. Under modern civilization among the essential rights of man are those connected with sacredness of private contract and private property. These cannot be interfered with by any government, Federal or local, except by due process of law.

Porto Rico—Excise Law.

5. Porto Rico has had from the beginning of the American occupation an excise law, largely modeled upon the national. The law of 1919 extends this to many new articles, and its machinery, including inspection, is much more elaborate.

Bouret v. Benedicto.

Excise Taxes—Nature.

6. An excise tax is one laid upon commodities which are to be consumed, and may be imposed at any time between production and consumption. Payment of the tax comes ultimately out of the consumer. Quaere, as to a local excise tax requiring examination of the mails.

Interstate Commerce—Porto Rico.

7. Porto Rico is subject to the interstate commerce clause of the Constitution. Congress not having legislated on the subject as to Porto Rico, Porto Rico cannot do so.

Interstate Commerce—Local Taxation.

8. Local taxation cannot affect property in process of interstate transportation. It is limited to property after it has arrived at its destination and is at rest.

Interstate Commerce—General Regulation.

9. Interstate commerce requires a national plan, and the absence of legislation by Congress is an intimation that there can be no regulation. This applies both to excise and to property taxation. Goods have not reached their destination until they have come within the control of the consignee.

Interstate Commerce Law—Repeal.

10. The repeal of the Interstate Commerce Law as to Porto Rico affected only internal commerce of the Island, and not its commerce with the states.

Constitutional Law—Part of Law Invalid.

11. A part of a law may be invalid without affecting the rest unless the parts are so connected as to make a system, of which one portion cannot stand alone without the other.

Porto Rico—Uniform Taxation.

12. Porto Rico is subject to the principle that taxation shall not discriminate against property or persons, but this does not prohibit reasonable adjustment of subjects and methods of taxation.

*Mr. H. G. Molina* for plaintiff.

*Messrs. Salvador Mestre* and *Edmond Block* for defendant.

Bouret v. Benedicto.

HAMILTON, Judge, delivered the following opinion:

The bill in this case was filed on November 19, 1919, seeking to enjoin the Treasurer of Porto Rico from collecting certain taxes under the Porto Rican Act of June 15, 1919 (No. 55, Acts 1919, pp. 226–300). The bill alleges that the plaintiff is a French citizen doing business in San Juan as a dealer in jewelry, and that the defendant Treasurer has stopped several shipments of his goods from New York at the San Juan Post-office and Express Company, and exacts payment of 25 per cent excise taxes before the goods will be delivered to plaintiff. The allegations of the bill are similar to those in the Universal Film Company Case just decided, post, 437, except that here there has been no payment under protest and suit to recover back the amount so paid, and there is the additional allegation by plaintiff Bouret that travelers purchase in New York and bring in their baggage without the payment of any tax jewelry similar to that on which he is required to pay taxes, with the result of discrimination against him. Defendant has filed a special appearance, a motion to quash, and also a motion to dismiss upon substantially the same grounds as in the Universal Film Company Case, and has filed also an affidavit that if any taxable jewelry is brought in by travelers he does not know of it, and would proceed against anyone so offending whom the plaintiff might report.

1. The question as to lack of proper parties seems to stand upon the same ground as a similar application in the case of the Porto Rico American Tobacco Co. v. Benedicto, decided in this court (10 Porto Rico Fed. Rep. 565) and affirmed by the circuit court of appeals, 167 C. C. A. 545, 256 Fed. 417. It

is quite true that in a subsequent case of the Camuñas v. New York & P. R. S. S. Co. 171 C. C. A. 76, 260 Fed. 40, it was held in the circuit court of appeals that the Workmen's Relief Commission is in effect the people of Porto Rico and as such cannot be sued. This court had held that they could be sued, but the upper court, upon grounds not presented here below, held otherwise. The circuit court of appeals in effect held that the Workmen's Relief Law took away the liability of corporations for accidents, and made the people of Porto Rico liable in their place. This being held, of course it follows that the people of Porto Rico are as much involved in the result of a suit as the state of Georgia in the leading case of Cunningham v. Macon & B. R. Co. 109 U. S. 446, 27 L. ed. 992, 3 Sup. Ct. Rep. 292, 609, where the state held the title to the railroad sought to be foreclosed. That case divided the occasions when suit could be entertained against officers of the sovereign into at least three classes. First is where the property comes under the control of a court in the regular course of judicial administration. There a state claiming it must come in like other parties. Another class is where an official is sued in tort for some act injuring another, and there the state is not interested, because the sovereign can do no wrong. A more controverted class is where the suit is against an officer of the government who has well-defined duties imposed by law, although not affecting the general governmental functions; there suit can be entertained only where official discretion is not involved. Scoville v. Soler, 10 Porto Rico Fed. Rep. 308, would come under this head. In no case, however, is there jurisdiction by mandamus at law or decree in chancery to take charge of the treasury of the state and distribute the funds in the manner which

Bouret v. Benedicto.

the court might think just. The Supreme Court in the Cunningham Case say: " . . . it must be confessed that, in regard to both classes of cases, the questions raised have rarely been free from difficulty, and the judges of this court have not always been able to agree in regard to them. Nor is it an easy matter to reconcile all the decisions of the court in this class of cases." 109 U. S. p. 451. However, the circuit court of appeals considered the fund involved in the Camuñas Case as practically the insular treasury, which would present a case not within judicial control. They do not and could not intimate any change of view as to a suit against the Treasurer acting under an invalid law, which under the allegations of the bill would be the case at bar.

2. It is true the mere fact that a law is unconstitutional does not entitle a party to relief by injunction, and for that purpose it must appear either that he has no adequate remedy by the ordinary processes of law, or that the case falls under some recognized head of equity jurisdiction. Cruickshank v. Bidwell, 176 U. S. 73, 44 L. ed. 377, 20 Sup. Ct. Rep. 280. Revised Statutes, § 723, Comp. Stat. § 1244, forbidding suits in equity where there is a plain, adequate, and complete remedy at law, certainly means something. If only declaratory of what was always the law, it must at least have been intended to emphasize the rule. New York Guaranty & Indemnity Co. v. Memphis Water Co. 107 U. S. 205, 214, 27 L. ed. 484, 487, 2 Sup. Ct. Rep. 279 (Bradley). Inadequacy of legal remedy exists where the case demands preventive relief, such as prevention of multiplicity of suits or irreparable injury. In the case at bar it is claimed the plaintiff could sue whoever is in possession of the goods and there allege the invalidity of the

excise law, or plaintiff can make payment under protest and sue to recover back.

It has been held that danger of suits for other importations in the case of impure tea does not confer a right to go into a court of equity. Cruickshank v. Bidwell, supra. In the case at bar, however, there is no question as to the propriety of the goods brought in, and a different rule would hold. It would seem, moreover, that the case is within the principle of Cummings v. Merchants' Nat. Bank, 101 U. S. 153, 156, 25 L. ed. 903, 904, where the bank sought to enjoin the collection of a tax wrongfully assessed against shares of stockholders, which the bank was required to pay for them. There the fiduciary character in which the bank stood to the stockholders entitled it to come into a court of equity for relief. So here the excise tax by its nature is to be paid ultimately by the consumers. The dealer, therefore, is much in the case of the bank in relation to its stockholders, and is required to pay a multitude of taxes for which he must be reimbursed by the purchasers.

The inadequacy of the remedy at law is the basis of jurisdiction in cases of trespass, and it is now well settled that equity will interfere to prevent the commission or continuance of a trespass where full and ample relief cannot be granted at law, as well as where relief is necessary to prevent a multiplicity of suits. 22 Cyc. 827. If an injury would be irreparable or the trespass is continuous, the remedy at law would not be adequate. Chancellor Kent in Livingston v. Livingston, 6 Johns. Ch. 497, 10 Am. Dec. 353, and Jerome v. Ross, 7 Johns. Ch. 315, 11 Am. Dec. 484, narrowed the remedy to comparatively few trespasses of an extraordinary nature. But this is no longer the rule. Now injunction is granted where being

Bouret v. Benedicto.

continuous or repeated full compensation for the entire wrong cannot be obtained in one action at law. Pom. Eq. Jur. 2d ed. § 1357. Thus in the case at bar a jeweler who brings practically all his stock from the United States is subjected to seizure of every consignment. If he stopped to litigate every seizure there would be an entire destruction of his business. There certainly could not be full compensation in one action at law, and the legal remedy would even otherwise be inadequate on account of the lapse of time before the matter could be finally settled in the Supreme Court of the United States. The courts have come to the conclusion that prevention is better than cure, because prevention is adequate while cure is not, and this apart from the question whether a remedy is adequate which on its face is limited to local courts in a matter where for many reasons the person injured may prefer the national courts.

A full discussion of this point, however, is not required, because it is foreclosed by the decisions in this court and the circuit court of appeals in the case of Benedicto v. West India & P. Teleg. Co. 167 C. C. A. 545, 256 Fed. 417, supra, and in the Porto Rico American Tobacco Co. Case, supra. "The acts or threatened acts of interference with plaintiff's rights and business were and are, . . . without warrant, and on that ground as well as to avoid a multiplicity of suits there is plainly jurisdiction in equity." Ex parte Young, 209 U. S. 123, 52 L. ed. 714, 13 L.R.A.(N.S.) 932, 28 Sup. Ct. Rep. 441, 14 Ann. Cas. 764; Benedicto v. West India & P. Teleg. Co. 167 C. C. A. 545, 256 Fed. 417, 421, 10 Porto Rico Fed. Rep. 444.

3. This case, like many others, arises under the peculiar situation of Porto Rico relative to the United States, a situation which always requires careful consideration. Porto Rico is not

a state of the Union, is not an independent state under the protection of the United States, and is not yet a territory incorporated into the Union, that is to say, a territory on the way to statehood. It is a territory in gestation and it doth not yet appear what it shall be. Nevertheless it is inhabited by American citizens, and foreigners have the same but no greater rights here than upon the mainland of the United States. The Americans have not only brought with them in a general way the rights of American citizens, as the English colonists brought with them to the Thirteen Colonies the rights of Britons, but the bulk of these rights have been enumerated in the Bill of Rights prefixed to the present Organic Act of March 2, 1917, and Porto Rico is by § 9 of this act subject to all general legislation of the United States not locally inapplicable. Comity extends these rights to alien friends.

4. As the questions at bar relate to constitutional law, some general principle may be laid down. In the first place, the American Constitution, which at least in its broad outlines has been made applicable here by the Organic Act, makes sacred from encroachment, whether by the general government or by the local government, and from the action of any department of either government, certain rights, which, to use the expression of the Declaration of Independence, are inalienable. In French nomenclature these are called the Rights of Man, and in recent decisions, referred to in the Tapia Case, they are spoken of as "essential rights." Re Tapia, 9 Porto Rico Fed. Rep. 452, 456. Whatever may have been the historical development on these subjects in the past, and whatever may be the future evolution, the fundamental basis of the American Constitution in civil matters is sacredness both of contract and

of property. Along with the change from status to contract mentioned by Maine, there grew up as part of the same development the right of individual property, first in movables and afterwards in immovables, and this is the basis of modern civilization, American and European. Both the 5th and the 14th Amendments recognize the importance of life, liberty, and property,—the one prohibiting interference with these without due process of law on the part of the Federal and the other on the part of the state governments, while on the other hand in the Constitution as originally adopted it was provided in § 10 of art. 1 that no state shall pass any "law impairing the obligation of contracts." There have been discussions as to the individual basis of property, and changes may come in the direction of greater regard to public interest in its management, but until there is some amendment of the fundamental law property and contract must be regarded as the basis of legal rights under the American Constitution. Their enjoyment cannot be interfered with by government—national, state, or territorial—any more than it can be interfered with by individuals, except by due process of law, a principle which applies as well to Porto Rico as to the mainland of the United States, as is expressly declared in § 2 of the Bill of Rights, contained in the Organic Act. In the matter of civil law the Treaty of Paris and acts of Congress would seem to leave Porto Rico free to develop in her own way. At the same time it is to be remembered that all her institutions are based upon the Spanish civil law as it came down from Rome, and that so far as property and contract are concerned these are those which western civilization has transmitted to the continent of Europe and substantially to the whole western world. Indeed the basis

XI. Porto Rico.—17.

of modern property and contract is purely Roman. The Anglo-Saxons did not adopt fully the Roman system in regard to family, adoption, divorce, and other questions of status, and these therefore differ in Porto Rico from continental America; but they are not in question and probably will never be in question, inasmuch as they are social questions already reserved on the continent also to the individual states. Porto Ricans have been made American citizens with all that this implies, and their surroundings and outlook are the same as other Americans. Whether this status can ever be changed, whether Congress could revoke citizenship when once granted, except for crime as provided in the Constitution, is a question which does not at present arise. The general political relations of Porto Rico under the Organic Acts of May 1, 1900, and March 2, 1917, are those of a territory of the United States. Porto Rico has some differences from other political divisions of the United States due to its geographical position, and as shown by the debates and by legislation these have been recognized by Congress; but politically they do not extend the powers of government beyond those necessary for internal concerns and interests of Porto Rico. In no sense of the word has Porto Rico an independent control over what elsewhere are national instrumentalities. As declared by this court in the Porto Rico Tobacco Co. v. Benedicto, 10 Porto Rico Fed. Rep. 565, and affirmed by the circuit court of appeals, it is highly improbable, if not contrary to reason, to suppose that Congress ever intended to make an exception to its general line of policy by the delegation to the local assembly of legislative authority not existing in the legislatures of the independent states, and which Congress has not intrusted to the continental territories of the United States, like Alaska. Benedicto v. West India & P.

Teleg. Co. 167 C. C. A. 545, 256 Fed. 420, s. c. 10 Porto Rico Fed. Rep. 444.

5. The subject of revenues is of course one inherent in every government, and this has been true of Porto Rico almost from the beginning. Under the Foraker Act, Congress provided in § 3 that duties on merchandise to or from Porto Rico and the United States should be 15 per cent of those on foreign merchandise, this to be applied to the expenses of Porto Rico. It was under this impost that the Insular Cases arose. This rule was intended to be temporary, as provided in the same section; for when the legislative assembly of Porto Rico had put in operation a system of local taxation and the President had made proclamation to that effect, this system of tariff duties should cease, and thereafter all merchandise between the United States and Porto Rico was to be free of duty. Accordingly Porto Rico passed a law January 31, 1901, and proclamation was made by the President of the cessation of tariff accordingly on July 25, 1901. The proclamation is found in Compilation, p. 1045. This situation has been carried forward into the Foraker Act (§ 3) and continued in the present Jones Act (§ 58). The revenue act became part of title IX., entitled "Revenues," of the Political Code of Porto Rico adopted March 1, 1902. This title was divided into three chapters. The first is entitled "the Assessment of Property," relating to the property tax and covering also its collection. Chapter 3 covers the inheritance tax, with its assessment and collection. Chapter 2, entitled "Excise Taxes," embraces §§ 356–367 of the Political Code. This chapter declares that certain taxes shall be collected in respect to ". . . distilled, vinous and fermented liquors, cigars, cigarettes, tobacco, proprietary medicinal preparations,

playing cards, firearms, oleomargarin, matches, and for and in respect to all other occupations, documents, instruments, matters and things mentioned and described in the following schedules, A, B, and C. . . ." Of these schedules, "A" relates to specific taxes on distilled spirits, rum, malt, or vinous liquor, cigars, cigarettes, other tobacco, playing cards, patent medicines, oleomargarin, arms and ammunition, and matches. Schedule "B" provides an annual tax upon dealers in spirits, beer, wines, themselves in certain classes, dealers in tobacco in several classes, and dealers in arms. Schedule "C" provides for a specific tax of $1 "on all entries into Porto Rico of merchandise imported from foreign countries," and a fee also on instruments attested and recorded. Section 357 provides that these taxes shall be paid by stamps to be canceled. A bureau of internal revenue was provided, and there followed provisions as to misdemeanors by its employees, with many details as to stamps, misdemeanors, fines, etc. Section 358 requires manufacturers and importers of articles mentioned in schedule "A" above to give bond, and "all owners or agents of ocean-going ships shall furnish the Treasurer such detailed information from the manifests of cargoes of ships entering or leaving ports in Porto Rico as may by regulations issued by the Treasurer be deemed necessary for the proper imposition of the documentary taxes on entries imposed in schedule 'C,' § 356, hereof, and to secure the full collection thereof."

This law has been amended from time to time and particularly by the Act of March 9, 1905, found in the Compilation, pp. 572–583, which pursues the same general plan but with additions and greater detail. In 1911 it was provided that taxable goods coming into Porto Rico from the United States by

Bouret v. Benedicto.

mail or express may be removed to a bonded warehouse, and on articles so imported from other countries the tax shall be paid at the time of making the customhouse entry; and then follows the same provision as in the Political Code.

On June 15, 1919, there was approved an act which was to be known as the Excise-Tax Law of Porto Rico. It was declared that an emergency existed and that therefore the act should take effect upon its approval. An important feature was that this law does not claim to be an inspection law of any kind, but is designed to "provide revenues for the people of Porto Rico by levying certain excise and license taxes for the practice of certain professions, industries, and businesses," and the like. The law contains ninety-three sections, divided into three titles. The first title gives definitions of terms used in the act, the second title, called "Excise and License Taxes," is divided into two parts, of which the first contains twenty-six subjects of excise taxes, and the second part contains a list of manufacturers and dealers in certain articles, principally alcoholic, tobacco, and the like, as well as certain sections as to classification, times of payment, revocation, and the like. Title III. relates to levy and payment of taxes, and under this § 27 attaches the tax to merchandise as soon as manufactured in Porto Rico, and § 31 prescribes that taxes on articles "introduced or brought into Porto Rico from the United States shall be paid before such articles leave the custody of the owner or agent of the vessel in which such articles are brought," and in § 32 the agent of ocean vessels shall submit copies of manifests of bills of lading. Under § 36 every person failing to pay the taxes is guilty of a misdemeanor, and the merchandise is to be confiscated and sold for the benefit of the people of Porto Rico.

Bouret v. Benedicto.

Title IV. contains general provisions as to buildings, warehouses, bonds, certificates, examination of books and labels. Title V. contains provisions applicable to stills. Title VI. contains provisions applicable to cigars, cigarettes, and tobacco. Under title VII. are penalties not included in other sections of the act. Title VIII. contains provisions as to counterfeiting of stamps; title IX., inspection, including searches; and title X. covers administrative provisions, such as regulations by the Treasurer of Porto Rico, fines, duties of employers, and fines for violations of provisions by employees.

In this law, therefore, inspection is only incidental to its enforcement. Nor does it purport on its face to be a general property tax. It picks out certain articles, apparently considered to be in the nature of luxuries, and imposes a high tax, in the case at bar 25 per cent ad valorem, and in some cases, but not in that of the plaintiff, who is a jeweler, provides for license tax every three months for certain occupations. So far as relates to the plaintiff, the license tax need not be considered, and the question is whether he is subject to the tax found in the 23d subdivision of § 18, relating to gems and precious stones, and, supposing that he is liable to the tax, whether he is liable to pay it "before such articles leave the custody of the agent or owner of the vessel in which they are brought" or other carrier.

It is to be observed that Porto Rico has from 1901 had an excise license law different from that of many if not all the states, and modeled largely upon the national law. This system was known to the government of the United States and was the basis of the change of system made by the President's proclamation of 1901. The law now under consideration has departed widely from that original act, for it adds motor ve-

Bouret v. Benedicto.

hicles, phonographs, pianos, cinematographic films, jewelry
and billiard tables, and the machinery of enforcement is much
more elaborate and far reaching. The original scheme related
to certain things like tobacco and liquor, which were recognized
as property, but property which required certain inspection and
supervision for the public protection. The law has now been
extended to other things which stand in a different category.
Certainly this is true of jewelry, which is a luxury only in the
sense that it is not a necessity; for it has always appealed to the
artistic sense, and has been among the articles used by men and
women from the earliest times. The right of Porto Rico to
impose an excise law may under the history of that legislation
be conceded for the purposes of this case, provided it be not a
cover for duties or other imposts forbidden by the Constitution
and does not conflict with national policy or agencies.

6. Is the tax in question properly an excise tax? Great
Britain at the time of the Revolution had an excise tax, and this
has been the basis of the American system. Dr. Johnson de-
fined excise in his dictionary as "a hateful tax levied upon
commodities," and Blackstone speaks of the list as one "which
no friend to his country would wish to see further increased."
The definition of an excise tax is one laid upon articles of
consumption at some convenient time intermediate between the
beginning of manufacture and the act of consumption. Patton
v. Brady, 184 U. S. 617, 46 L. ed. 718, 22 Sup. Ct. Rep. 493;
1 Bl. Com. 318; Story, Const. 953. Cooley speaks of it as an
inland impost upon manufactures, but also adds licenses to
pursue certain trades and deal in certain commodities. Cooley,
Taxn. 3. Precisely the same definitions are given in the dic-
tionaries. The general idea, therefore, is that it is an internal

tax levied upon the manufacture, consumption, or retail sale of a commodity. License Tax Cases, 5 Wall. 462, 18 L. ed. 497. The first prominent American act was that passed July 1, 1862 (12 Stat. at L. 432, chap. 119, Comp. Stat. § 490, 3 Fed. Stat. 'Anno. 2d ed. p. 976), applied to liquors and tobacco. The amount was increased during the Spanish-American War, but the typical law of excise taxes is that adopted in 1919 to pay the expenses of the great World War. 40 Stat. at L. 1122, chap. 18, Comp. Stat. § 6309⅘ a, 1 Fed. Stat. Anno. Supp. 1919, p. 160. This tax is levied on articles sold by the manufacturer, producer, or importer, and includes automobiles, pianos, and many other articles more or less in the nature of luxuries, works of art, and many familiar articles above certain fixed values. Then follows a tax of 5 per cent upon all articles commonly or commercially known as jewelry, watches, opera glasses, when sold by or for a dealer or his estate for consumption or use. The same law applies also to motion pictures, toilet articles, proprietary medicines, and the tax may be collected at the option of the commissioner by a stamp affixed by the vendor or direct payment by the purchaser, all to be paid to the United States by the vendor.

It would seem, therefore, that an excise tax is one upon commodities which are to be consumed, and may be imposed at any time between the production and the consumption, the payment coming ultimately out of the consumer. It is certainly unusual for such a tax to be levied on goods while in process of transmission from the manufacturer to the dealer or vendor, but if there are no other objections there does not seem to be any law against such collection. When levied on property in the hands of a steamship company or express company, or in the United

States postoffice, it is at a time intermediate between manufacture and consumption.

The importance of the application made in this case is fully appreciated. On one side the revenue is needed by the people of Porto Rico to take the place of that lost through the abolition of revenues from liquor licenses, and on the other there is involved the rights of citizens under the Constitution of the United States. While it will not be necessary to pass upon the point under the pleadings in this case, it may be noted that collaterally there is also involved the question whether local officials can exercise authority within the walls of the postoffice, and indeed whether the postmaster or postal authorities can permit an outsider to have access to the mail of a citizen. Rev. Stat. §§ 3995, 3996, Comp. Stat. §§ 10,371, 10,372.

7. The question how far Porto Rico may regulate commerce by an excise tax arises on the pleadings in the case. As to commerce, there are two distinct classes,—foreign commerce and domestic commerce. The power of Congress over both is derived from the same clause of the Constitution, that is to say, in § 8 it is provided that the Congress shall have power "to regulate commerce with foreign nations and among the several states." Commerce is used only once in this double-headed clause, and is to be considered as the same thing in whichever of the two ways it is exercised. The nature of foreign and that of domestic commerce, however, requires somewhat different rules of construction in these two respective directions.

It was early decided in several cases, of which Brown v. Maryland, 12 Wheat. 419, 6 L. ed. 678, is typical, that taxation imposed by the states upon imported goods, whether levied directly on the goods or indirectly by burdening the right to

dispose of them, is unconstitutional, because, in addition to the general right of Congress to regulate such commerce, it is also provided in art. 1, § 10, among the prohibitions to the states, that "no state shall, without the consent of the Congress, lay any imposts or duties on imports or exports except what may be absolutely necessary for executing its inspection laws." The subject, therefore, was both positively put within the control of Congress and absolutely prohibited to the states, except for incidental purposes. It has been held that the subjects of light-houses, pilots, and the like are within the control of the respective states, but only until Congress takes control. Cooley v. Port Wardens, 12 How. 299, 319, 13 L. ed. 996, 1004. The rule is that a lack of legislation by Congress is in effect a declaration that there shall be no legislation. Welton v. Missouri, 91 U. S. 283, 23 L. ed. 350 (Field). Perhaps the best way to look at the matter of pilotage and the like is that this is not so much a local regulation as an adoption by Congress for its own purposes of aids furnished locally rather than by national legislation on the subject. In other words, there have to be light-houses, pilots, quarantine, and the like, and Congress has full power to provide all necessary means of the kind. Until Congress so acts, any local provision is to be considered as proper. On the other hand, anything that is not necessary to commerce could not be imposed by a state even temporarily, for it is not to be supposed that Congress would make any such regulation itself, and cannot be supposed to adopt any regulation made provisionally by a state.

As to taxation, it is settled that where goods are imported from abroad they preserve their character as imports, and are not subject to direct or indirect state taxation so long as they

remain unsold and in the original packages. Brown v. Maryland, supra; May v. New Orleans, 178 U. S. 496, 44 L. ed. 1165, 20 Sup. Ct. Rep. 976. This rule, and all connected with imports, is to be considered as limited to goods brought from abroad, that is, from countries foreign to the United States. In such cases the importation is not complete until such goods have reached their destination. In the case at bar of course there is no question of foreign commerce, for the goods are brought from the United States, and whatever rules control the subject must be those connected with domestic, or as it is generally called, interstate commerce. Woodruff v. Parham, 8 Wall. 123, 19 L. ed. 382.

8. The provision as to commerce between the states is contained in the same clause of the Constitution as that connected with foreign commerce, and there are strong analogies between them. It has been held, therefore, that goods passing from one state to another do not become mingled with the general property of the new state until either the form of the package or the ownership of the original package has changed and the property has thus become at rest, enjoying the protection of the new state. Thereafter there is no prohibition in the Constitution against local regulation by the states. This may be very necessary, inasmuch as the national government has no customhouses for examination of goods passing between the states and no means of inspection at the state line any more than at any other point in the transit. If there is anything in interstate commerce which affects the state as such, it must be looked after by the state and at or near the state line. It is accordingly held that regulations may be made by the state to cover such cases, whether for police or tax purposes, and these, if

incidental, are not to be considered as infringing any law of
Congress or any right of property under the proper interpreta-
tion of interstate commerce.   Thus, in the leading case of
Woodruff v. Parham, supra, it was held legitimate for the local
authorities at Mobile to impose a uniform tax upon auctioneers,
which would apply as well to goods coming from other states
as to those produced in the state of Alabama.   Kelley v. Rhoads,
188 U. S. 1, 47 L. ed. 359, 23 Sup. Ct. Rep. 259, holds that
sheep driven at a reasonable rate of speed from Utah through
Wyoming to a railroad station in Nebraska are property en-
gaged in insterstate commerce to such an extent as to be exempt
from taxation by the state of Wyoming even though the sheep
graze along the way.   On the other hand, logs cut in New
Hampshire for exportation to another state are nevertheless
liable to taxation as a part of the general mass of property of
the state of origin until actually started in the course of trans-
portation by delivery to a common carrier or otherwise.   Tak-
ing them to a depot without such delivery is not part of this
transportation.   While in such interstate commerce, they are
not taxable in the state through which they are passing.   Coe
v. Errol, 116 U. S. 517, 29 L. ed. 715, 6 Sup. Ct. Rep. 475
(Bradley); Diamond Match Co. v. Ontonagon, 188 U. S. 82,
47 L. ed. 394, 25 Sup. Ct. Rep. 266.   In other words, the test
for the beginning of interstate commerce is whenever the com-
modity has begun to move as an article of trade from one state
to another, that is to say, the movement of transportation from
one state to another has begun as distinguished from the pre-
liminary work of putting the property in a state of preparation
for such movement.   The Daniel Ball, 10 Wall. 557, 565, 19
L. ed. 999, 1002; Coe v. Errol, 116 U. S. 528, 29 L. ed. 719,

Bouret v. Benedicto.

6 Sup. Ct. Rep. 475. On the other hand, the arrival of such goods at the point of destination terminates interstate commerce. Thus, coal shipped from Pittsburgh to New Orleans has reached its destination and is liable to taxation by Louisiana when the barge has anchored or tied up at New Orleans, regardless of whether the coal is to be sold to a foreign ship or is for domestic use, or remains at rest and unsold as private property. Its being in the original receptacle makes no difference if it has reached its place of rest and become a commodity in the market. Brown v. Houston, 114 U. S. 622, 632, 29 L. ed. 257, 260, 5 Sup. Ct. Rep. 1091. In such case it is liable to local taxation. To the same effect is Pittsburg & S. Coal Co. v. Bates, 156 U. S. 577, 39 L. ed. 538, 5 Inters. Com. Rep. 30, 15 Sup. Ct. Rep. 415, in which coal was also on the Mississippi river, but had not reached its destination at New Orleans. It was at rest awaiting sale, however, at convenience of the consignee, and was never intended to. be returned up the Mississippi river to the Pittsburgh owners. The fleet of coal barges had not been separated, but that was a matter of detail, and probably of a short time in the future. The coal had reached the state of Louisiana and there it was to remain. Accordingly it was held subject to the tax laws of the state. Somewhat similarly the state of Alabama imposed a tax on dealers introducing liquors into the state for sale, and thereupon Hinson, a Mobile merchant, filed a bill to restrain Tax Collector Lott. The facts show that the goods, in this case whisky, had reached the store or warehouse of the dealer and were there taxed as property. As local products were taxed equally, the case was dismissed. Hinson v. Lott, 8 Wall. 148, 19 L. ed. 387.

9. Upon the whole, therefore, a state, or in this case a ter-

Bourct v. Benedicto.

ritory, can no more regulate or impede interstate commerce, or in this case commerce between a state and a territory, than it can regulate or impede foreign commerce. Brown v. Houston, 114 U. S. 632, 29 L. ed. 260, 5 Sup. Ct. Rep. 1091. The rule is that interstate commerce is national in its scope and cannot be regulated by local authority. The old rule announced by Chief Justice Taney in Peirce v. New Hampshire, 5 How. 504, 12 L. ed. 256, has been expressly overruled, and the constitutional theory in force is that interstate commerce requires a national plan and national supervision; and the absence of legislation by Congress, so far from giving the states authority to regulate, is an indication by Congress that there shall be no regulation. Leisy v. Hardin, 135 U. S. 100, 34 L. ed. 128, 3 Inters. Com. Rep. 36, 10 Sup. Ct. Rep. 681; Bowman v. Chicago & N. W. R. Co. 125 U. S. 507, 31 L. ed. 714, 1 Inters. Com. Rep. 823, 8 Sup. Ct. Rep. 689, 1062. Illustrations of invalid regulations by states abound in the Supreme Court decisions:

"A tax upon freight transported from state to state, State Freight Tax Case, 15 Wall. 232, 21 L. ed. 146; a statute imposing a burdensome condition on ship masters as a prerequisite to the landing of passengers, Henderson v. New York (Henderson v. Wickham) 92 U. S. 259, 23 L. ed. 543; a statute prohibiting the driving or conveying of any Texas, Mexican, or Indian cattle, whether sound or diseased, into the state, between the 1st day of March and the 1st day of November in each year, Hannibal & St. J. R. Co. v. Husen, 95 U. S. 465, 24 L. ed. 527; a statute requiring every auctioneer to collect and pay into the state treasury a tax on his sales, when applied to imported goods in the original packages by him sold for the importer, Cook v.

Pennsylvania, 97 U. S. 566, 24 L. ed. 1015; a statute intended to regulate or tax, or to impose any other restriction upon, the transmission of persons or property, or telegraphic messages, from one state to another, Wabash, St. L. & P. R. Co. v. Illinois, 118 U. S. 557, 30 L. ed. 244, 1 Inters. Com. Rep. 31, 7 Sup. Ct. Rep. 4; a statute levying a tax upon nonresident drummers offering for sale or selling goods, wares, or merchandise by sample, manufactured or belonging to citizens of other states, Robbins v. Taxing Dist. 120 U. S. 489, 30 L. ed. 694, 1 Inters. Com. Rep. 45, 7 Sup. Ct. Rep. 592.

"On the other hand, we have decided in Mobile County v. Kimball, 102 U. S. 691, 26 L. ed. 238, that a state statute providing for the improvement of the river, bay, and harbor of Mobile, since what was authorized to be done was only as a mere aid to commerce, was, in the absence of action by Congress, not in conflict with the Constitution; in Escanaba & L. M. Transp. Co. v. Chicago, 107 U. S. 678, 27 L. ed. 442, 2 Sup. Ct. Rep. 185, that the state of Illinois could lawfully authorize the city of Chicago to deepen, widen, and change the channel of, and construct bridges over, the Chicago river; in Parkersburg & O. River Transp. Co. v. Parkersburg, 107 U. S. 691, 27 L. ed. 584, 2 Sup. Ct. Rep. 732, that the jurisdiction and control of wharves properly belong to the states in which they are situated unless otherwise provided; in Brown v. Houston, 114 U. S. 622, 29 L. ed. 257, 5 Sup. Ct. Rep. 1091, that a general state tax laid alike upon all property is not unconstitutional because it happens to fall upon goods which, though not then intended for exportation, are subsequently exported; in Morgan's L. & T. R. & S. S. Co. v. Board of Health, 118 U. S. 455, 30 L. ed. 237, 6 Sup. Ct. Rep. 1114, that a state law requiring each vessel

passing a quarantine station to pay a fee for examination as to her sanitary condition and the ports from which she came was a rightful exercise of police power; in Smith v. Alabama, 124 U. S. 465, 31 L. ed. 508, 1 Inters. Com. Rep. 804, 8 Sup. Ct. Rep. 564, and in Nashville, C. & St. L. R. Co. v. Alabama, 128 U. S. 96, 32 L. ed. 352, 2 Inters. Com. Rep. 238, 9 Sup. Ct. Rep. 28, that a state statute requiring locomotive engineers to be examined and obtain a license was not in its nature a regulation of commerce; and in Kimmish v. Ball, 129 U. S. 217, 32 L. ed. 695, 2 Inters. Com. Rep. 407, 9 Sup. Ct. Rep. 277, that a statute providing that a person having in his possession Texas cattle which had not been wintered north of the southern boundary of Missouri at least one winter shall be liable for any damages which may accrue from allowing them to run at large, and thereby spread the disease known as the Texas fever, was constitutional. . . .

"These decisions rest upon the undoubted right of the states of the Union to control their purely internal affairs, in doing which they exercise powers not surrendered to the national government; but whenever the law of the state amounts essentially to a regulation of commerce with foreign nations or among the states, as it does when it inhibits, directly or indirectly, the receipt of an imported commodity or its disposition before it has ceased to become an article of trade between one state and another, or another country and this, it comes in conflict with a power which, in this particular, has been exclusively vested in the general government, and is therefore void. Leisy v. Hardin, 135 U. S. 119–121, 34 L. ed. 136, 137, 3 Inters. Com. Rep. 36, 10 Sup. Ct. Rep. 681."

The test in this regard seems to be that the local authority

Bouret v. Benedicto.

may tax property, whether by excise or property tax, before it starts upon interstate commerce or after interstate commerce has ceased. To use the analogy of foreign commerce, "the point of time when the prohibition ceases and the power of the state to tax commences, is not the instant when the article enters the country, but when the importer has so acted upon it that it has become incorporated and mixed up with the mass of property in the country, which happens when the original package is no longer such in his hands; that the distinction is obvious between a tax which intercepts the import as an import on its way to become incorporated with the general mass of property, and a tax which finds the article already incorporated with that mass by the act of the importer." Brown v. Maryland, 12 Wheat. 419, 6 L. ed. 678, supra.

State laws, therefore, act altogether upon the internal or domestic traffic within their respective borders. They act upon the article after it has passed the line of foreign commerce and become a part of the general mass of property of the state.

These principles would seem to be applicable also to interstate commerce. Thus, in the case at bar the point would be as to whether interstate commerce had ceased. The question of original package, while important for some purposes, is not important as to taxation. If the goods have reached their destination, or, as it is otherwise expressed, their point of rest in Porto Rico, they are taxable by the authorities of Porto Rico. Whether owned by the shipper or by the consignee would not seem to be material; for, as said a long time ago, there is nothing poetical about tax laws, as Chief Justice Lowrie said (Finley v. Philadelphia, 32 Pa. 381), and they tax property where it is found. The only qualification is that it must be

Bouret v. Benedicto.

found technically at rest. No case has been called to the attention of the court fixing this point of time, but it must be when the goods cease to be under the control of the transporting medium. This cannot be said to be the case when the property is still in the hands of the agent of interstate transportation, unless perhaps it is in some warehouse for the convenience of the consignee. If the property is still under the control of a transporting agency it can hardly be said to have reached its place of rest, for the transporting agency by its very terms is concerned only with transportation.

This being so,—and on reason it would seem to be clear,— had the goods of complainant reached their destination or place of rest when they were in San Juan in the custody of the steamship company, express company, or the United States postal authorities, but could not be obtained by the owner until after payment of the tax? In principle there would seem to be no difference between this and collecting the tax at the mouth of the harbor, or taking the goods off the ship anywhere else before it reached the wharf. There was a distinct intervention of an outside force between the transportation agency and the consignee, that is to say, the taxing power, whether this were effected by putting a policeman in charge of the goods or by a direction to the transporting agency not to deliver the goods. It would seem to be very much like the case supposed by the United States Supreme Court (Brown v. Houston, 114 U. S. 634, 29 L. ed. 261, 5 Sup. Ct. Rep. 1091) when a policeman would be at every ferry and railroad station of New York city, with the duty to restrain the delivery of goods until a tax was paid. It may be that the tax would be valid when the goods had passed from the hands of the transporting agency to those

of Bouret, whether on the shelves of his store or as they were delivered to purchasers, and it might be that the difference when and where the tax was imposed would not be material to him so long as it was imposed; but it does make a difference in the validity of the law, for goods upon the shelves of a store are taxable locally, while goods in process of transportation between the United States and Porto Rico are not locally taxable.

10. Congress in 1887 passed the Interstate Commerce Law, reinforced by subsequent legislation giving extensive powers to an Interstate Commerce Commission in the way of enforcement. Porto Rico being a territory, this law as general legislation of Congress applied to its internal commerce also just as if Congress had acted as legislating for its local concerns. The distance of Porto Rico from the mainland, however, made supervision by that Commission difficult, and so in the Organic Act of 1917, § 38, the Interstate Commerce Law was repealed as to Porto Rico. But so far as concerns the questions presented in the case at bar the repeal is not important, for neither the jurisdiction of the Commission nor provisions of the act affecting the internal commerce of the island are involved, and these were the matters affected by the repeal. The principles above discussed arise under the constitutional provisions as to commerce, which could not be repealed by Congress. Interstate commerce external to the island is still governed thereby, and this applies to goods, like those of the plaintiff, brought from the continent. From any point of view, therefore, the provisions of the Excise Tax Law of Porto Rico are invalid so far as they affect the collection of the taxes complained of by the plaintiff.

11. Deciding void § 31 and other provisions as to collection of the excise, however, does not involve holding that the whole

Bouret v. Benedicto.

act is unconstitutional. One section or part of a law may be void and the rest may stand unless the good is so connected with the bad that the good cannot stand alone. Thus, it has been held that the machinery is so essential to a tax system that if that part of the legislation is void, the whole law falls. Harper v. State, 109 Ala. 28, 19 So. 857. It is not necessary in the case now presented to pass upon that point. All that is at present decided is that § 31 and all other parts providing for intervention of the tax officials before the jewelry and other goods in question reach their destination in the hands or control of the plaintiff is unauthorized and void.

And so it is unnecessary to decide the further question whether Porto Rico as a territory can, like the Philippines, have an excise system of greater scope than any state, one modeled upon the national rather than a state system. The fact that Congress does not formally disapprove a local act does not prove that Congress approves. In the multitude of great affairs pressing upon Congress it may well be that often the better if not the only way is to leave the validity to the courts. It may well be that the difference of origin, condition, and location of Porto Rico makes a tax system preferable which would not be available in the states and even in incorporated territories. The presidential proclamation and the long existence of this tax system, while not conclusive, might be very persuasive.

12. It seems to be contended on behalf of the people of Porto Rico that its tax laws are not governed by the rule of uniformity applied in the states in consequence of the provisions of the local constitutions. The Organic Act does not require a uniform rate of taxation in so many words, but its Bill of Rights adopts

Bouret v. Benedicto.

the provision of the 14th Amendment, that "no law shall be enacted in Porto Rico which shall deprive any person of life, liberty, or property without due process of law, or deny to any person therein equal protection of the laws." The last clause forbids discrimination even in taxation, although this provision was not intended to prevent the taxing power from adjusting its system in all proper and reasonable ways, including exemptions, different specific taxes, and even variety in rates of excise upon various products. Bell's Gap R. Co. v. Pennsylvania, 134 U. S. 232–237, 33 L. ed. 892–895, 10 Sup. Ct. Rep. 533 (Bradley). Clear and hostile discriminations against particular persons and classes, however, might be obnoxious to the constitutional prohibition. There is no Procrustean rule, or, as Mr. Justice Bradley expresses it, the 14th Amendment was not intended to compel the state to adopt an iron rule of equal taxation, but no greater burden should be laid upon one than is laid upon others in the same calling and condition. Barbier v. Connolly, 113 U. S. 27, 31, 28 L. ed. 923, 924, 5 Sup. Ct. Rep. 357 (Field).

It is alleged that the Porto Rican legislation complained of is discriminating as against products or goods brought from a state of the American Union. If a state, and a fortiori a territory, can tax goods because they come from a state of the Union, it is not only regulating interstate commerce, but discriminating between ports or parts of the United States, and enforcing inequality by law in a way which Congress itself could not. It is difficult to see how the stream can rise higher than its source, now that Porto Ricans are American citizens,— which was not the case during the temporary tariff regulations which were the basis of decision in the Insular Cases, 182 U. S.

Bouret v. Benedicto.

1, 45 L. ed. 1041, 21 Sup. Ct. Rep. 743. Is this done in the case at bar?

The Porto Rican Excise Tax Law in question provides in § 23 that the proposed internal revenue tax shall be levied, collected, and paid on all gems, jewels, and articles of jewelry and the like "produced, manufactured, introduced, or brought into Porto Rico" to the amount of 25 per cent ad valorem, and it may be said to be public or judicial knowledge that none of these are "produced within Porto Rico," to any merchantable extent. Either by judicial knowledge or certainly by easy proof it would result that this tax is imposed upon goods and can be imposed only upon goods brought from the United States into Porto Rico. But if this is so there is no discrimination in favor of local products, for there are none.

But another discrimination alleged in the bill is to the effect that passengers bring jewelry into Porto Rico in their baggage without detection, and so compete with the jewelry which plaintiff is compelled to import by freight, express or parcel post. On the other hand, the defendant Treasurer files an affidavit that he knows and intends no such discrimination, and that if plaintiff knows of any such cases he should report them. The law complained of, on its face, does provide for search by Porto Rican officials (§ 84), excepting, however, residences. Section 85 goes on to provide for inspection of any package supposed to contain taxable articles whenever the officer has reason to believe the tax imposed has not been paid. Laws 1919, p. 290. The fair execution of these provisions would be a matter of proof, which cannot at present be gone into. It is possible to provide a perfect law and at the same time also provide in its administration that it shall be enforced only against certain

people. Such a discrimination is as illegal as the other, and it may be said in passing that no authority can place the burden of executing a law upon the people who are to suffer from it. The people of Porto Rico cannot provide that a person who has to pay a tax shall.for his own protection also be a detective to report violations of law by others. This would on a larger scale be like a street car company requiring that people who do not smoke must themselves enforce a rule forbidding smoking. Such rules are not only wrong, but void.

Other questions discussed need not be passed upon. At least under the rules as to interstate commerce the 1919 Excise-Tax Law of Porto Rico is invalid so far as it affects the collection complained of.

It follows, therefore, that the motions to quash and dismiss the bill must be denied, and that the temporary injunction applied for must be issued upon bond of $3,000.

It is so ordered.