# MORGAN'S STEAMSHIP COMPANY *v.* LOUISIANA BOARD OF HEALTH & Another.

### ERROR TO THE SUPREME COURT OF THE STATE OF LOUISIANA.

Argued April 26, 27, 1886.—Decided May 10, 1886.

The system of quarantine laws established by statutes of Louisiana is a rightful exercise of the police power for the protection of health, which is not forbidden by the Constitution of the United States.

While some of the rules of that system may amount to regulations of commerce with foreign nations or among the States, though not so designed, they belong to that class which the States may establish until Congress acts in the matter by covering the same ground or forbidding State laws.

Congress, so far from doing either of these things, has, by the act of 1799 (ch. 53, Rev. Stat.) and previous laws, and by the recent act of 1878, 20, Stat., 37, adopted the laws of the States on that subject, and forbidden all interference with their enforcement.

The requirement that each vessel passing a quarantine station shall pay a fee fixed by the statute, for examination as to her sanitary condition, and the ports from which she came, is a part of all quarantine systems, and is a compensation for services rendered to the vessel, and is not a tax within the meaning of the Constitution concerning tonnage tax imposed by the States.

Nor is it liable to constitutional objection as giving a preference for a port of one State over those of another. That section (nine) of the first article of the Constitution is a restraint upon powers of the General Government and not of the States, and can have no application to the quarantine laws of Louisiana.

This was a writ of error to the Supreme Court of the State of Louisiana.

The plaintiff in error was plaintiff in the State court, and in the court of original jurisdiction obtained an injunction against the Board of Health prohibiting it from collecting from the plaintiffs the fee of $30 and other fees allowed by Act 69 of the Legislature of Louisiana of 1882, for the examination which the quarantine laws of the State required in regard to all vessels passing the station. This decree was reversed, on appeal, by the Supreme Court of the State, and to this judgment of reversal the present writ of error was prosecuted.

The grounds on which it was sought, in this court, to review the final judgment of the Louisiana court were thus stated in an amended petition filed in the cause in the court of first instance:

"The amended petition of plaintiffs respectfully represents:

"That all the statutes of the State of Louisiana, relied on by defendants for collection of quarantine and fumigation fees are null and void, because they violate the following provisions of the United States Constitution:

"Article first, section 10, paragraph 3, prohibits the States from imposing tonnage duties without the consent of Congress.

"Article first, section 8, paragraph 3, vesting in Congress the power to regulate commerce, which power is exclusively so vested.

"Article first, paragraph 6, section 9, which declares that no preference shall be given by any regulation of commerce to the ports of one State over that of another; nor shall vessels bound to or from one State be obliged to enter, clear, or pay duties in another."

The statute which authorizes the collection of these fees, approved July 1, 1882, is as follows:

"SEC. 1. *Be it enacted by the General Assembly of the State of Louisiana*, That the resident physician of the Quarantine Station on the Mississippi River shall require for every inspection and granting certificate the following fees and charges : For every ship, thirty dollars ($30) ; for every bark, twenty dollars ($20) ; for every brig, ten dollars ($10); for every schooner, seven dollars and a half ($7.50) ; for every steamboat (towboats excepted), five dollars ($5) ; for every steamship, thirty dollars ($30).

"SEC. 2. *Be it further enacted, &c.,* That the Board of Health shall have an especial lien and privilege on the vessels so inspected for the amount of said fees and charges, and may collect the same, if unpaid, by suit before any court of competent jurisdiction, and in aid thereof shall be entitled to the writ of provisional seizure on said vessels.

"SEC. 3. *Be it further enacted, &c.,* That all laws and parts of laws in conflict with the provisions of this act, are hereby

repealed, and all laws and parts of laws on the same subject-matter not in conflict or inconsistent herewith, are continued in full force and effect."

*Mr. H. J. Leovy* and *Mr. Joseph E. McDonald* for plaintiff in error.

We contend that all the provisions of the act of 1882, of 1870, and of the other acts, to which reference has been made, that impose charges on vessels to defray the expenses of a quarantine system, and to support a Board of Health, are null and void, for the following reasons:

*First.* Because they impose tonnage dues and conflict with the third paragraph, tenth section, of the first Article of the United States Constitution, which declares that "no State shall, without the consent of Congress, lay any duty of tonnage." *Steamship Co.* v. *Portwardens,* 6 Wall. 31; *Peete* v. *Morgan,* 19 Wall. 581; *State Tonnage Tax Cases,* 12 Wall. 204; *Cannon* v. *New Orleans,* 20 Wall. 580; *Henderson* v. *Mayor of New York,* 92 U. S. 259; *Inman Steamship Co.* v. *Tinker,* 94 U. S. 238; *Packet Co.* v. *Keokuk,* 95 U. S. 80; *Packet Co.* v. *St. Louis,* 100 U. S. 423; *Railroad Co.* v. *Ellerman,* 105 U. S. 166.

*Second.* Because, so far as they impose charges or duties on vessels engaged in the coast trade, or plying between ports of Louisiana and other States or countries, they are regulations of commerce and violate the third paragraph of the eighth section, first article of the United States Constitution, which vests in Congress the exclusive power to regulate commerce. 2 Curtis Hist. Const. 370; *Gibbons* v. *Ogden,* 9 Wheat. 1, 205; *State Freight Tax,* 15 Wall. 232; *Brown* v. *Maryland,* 12 Wheat. 419; *Passenger Cases,* 7 How. 283, 414; *Vicksburg* v. *Tobin,* 100 U. S. 430; *Packet Co.* v. *Catlettsburg,* 105 U. S. 559; *Transportation Co.* v. *Parkersburg,* 107 U. S. 691; *Cooley* v. *Port Wardens of Philadelphia,* 12 How. 299; *Steamship Co.* v. *Joliffe,* 2 Wall. 450; *Railroad Co.* v. *Husen,* 95 U. S. 465; *Gloucester Ferry Co.* v. *Pennsylvania,* 114 U. S. 197; *Moran* v. *New Orleans,* 112 U. S. 69; and cases cited under Point 1.

*Third.* Because, by imposing charges exclusively on vessels

passing the Mississippi River Quarantine Station, preference is given to vessels from the ports of one State over those of another, and duties are imposed on vessels bound from one State to another, in contravention of paragraph six, section nine, of the first Article of the United States Constitution. *Inman Steamship Co.* v. *Tinker,* above cited; *Guy* v. *Baltimore,* 100 U. S. 434.

*Fourth.* And we allege that said statutes are null and void, because they conflict with the provision of the act of Congress of 1799, 1 Stat. 16, relating to quarantine, which provides "that nothing herein shall enable any State to collect a duty of tonnage or impost without the consent of the Congress of the United States." *Railroad Co.* v. *Husen,* above cited; *State Freight Tax,* above cited; *Ward* v. *Maryland,* 12 Wall. 418; *Welton* v. *Missouri,* 91 U. S. 275; *Henderson* v. *Mayor of New York,* above cited; *Chy Lung* v. *Freeman,* 92 U. S. 275; *Gloucester Ferry Co.* v. *Pennsylvania,* above cited; *Steamship Co.* v. *Portwardens,* above cited.

*Mr. F. C. Zacharie* and *Mr. William M. Evarts* for defendants in error.

Mr. Justice Miller, after stating the case as above reported, delivered the opinion of the court.

The services for which these fees are to be collected are parts of a system of quarantine provided by the laws of Louisiana, for the protection of the State, and especially of New Orleans, an important commercial city, from infectious and contagious diseases which might be brought there by vessels coming through the Gulf of Mexico from all parts of the world, and up the Mississippi River to New Orleans.

This system of quarantine differs in no essential respect from similar systems in operation in all important seaports all over the world, where commerce and civilization prevail. The distance from the mouth of the Mississippi River to New Orleans is about a hundred miles. A statute of Louisiana of 1855, organizing this system, created a Board of Health, to whom its administration was mainly confided, and it authorized this

board to select and establish a quarantine station on the Mississippi, not less than seventy-five miles below New Orleans. Money was appropriated to buy land, build hospitals, and furnish other necessary appliances for such an establishment. This and other statutes subsequently passed contained regulations for the examination of vessels ascending the river, and of their passengers, for the purpose of ascertaining the places whence these vessels came, their sanitary condition, and the healthy or diseased condition of their passengers. If any of these were such that the safety of the city of New Orleans or its inhabitants required it as a protection against disease, they could be ordered into quarantine by the proper health officer until the danger was removed, and, if necessary, the vessel might be ordered to undergo fumigation. If, on this examination, there was no danger to be apprehended from vessel or passengers, a certificate of that fact was given by the examining officer, and she was thereby authorized to proceed and land at her destination. If ordered to quarantine, after such detention and cleansing process as the quarantine authorities required, she was given a similar certificate and proceeded on her way. If the condition of any of the passengers was such that they could not be permitted to enter the city, they might be ordered into quarantine while the vessel proceeded without them. Whether these precautions were judicious or not this court cannot inquire. They are a part of and inherent in every system of quarantine.

If there is a city in the United States which has need of quarantine laws it is New Orleans. Although situated over a hundred miles from the Gulf of Mexico, it is the largest city which partakes of its commerce, and more vessels of every character come to and depart from it than any city connected with that commerce. Partaking, as it does, of the liability to diseases of warm climates, and in the same danger as all other seaports of cholera and other contagious and infectious disorders, these are sources of anxiety to its inhabitants, and to all the interior population of the country who may be affected by their spread among them. Whatever may be the truth with regard to the contagious character of yellow fever and

cholera, there can be no doubt of the general belief, and very little of the fact, that all the invasions of these epidemics in the great valley of the Mississippi River and its tributaries in times past have been supposed to have spread from New Orleans, and to have been carried by steamboats and other vessels engaged in commerce with that city. And the origin of these diseases is almost invariably attributed to vessels ascending the Mississippi River from the West Indies and South America, where yellow fever is epidemic almost every year, and from European countries whence our invasions of cholera uniformly come.

If there is any merit or success in guarding against these diseases by modes of exclusion, of which the professional opinion of medical men in America is becoming more convinced of late years, the situation of the city of New Orleans for rendering this exclusion effective is one which invites in the strongest manner the effort. Though a seaport in fact, it is situated a hundred miles from the sea, and is only to be reached by vessels from foreign countries by this approach. A quarantine station, located as this one is under the Louisiana laws, with vigilant officers, can make sure of inspecting every vessel which comes to New Orleans from the great ocean in any direction. Safe and ample arrangements can be made for care and treatment of diseased passengers and for the comfort of their companions, as well as the cleansing and disinfecting of the vessels. The system of quarantine has here, therefore, as fair a trial of its efficacy as it could have anywhere, and the need of it is as great.

None of these facts are denied. In all that is important to the present inquiry they cannot be denied.

Nor is it denied that the enactment of quarantine laws is within the province of the States of this Union. Of all the elements of this quarantine system of the State of Louisiana, the only feature which is assailed as unconstitutional is that which requires that the vessels which are examined at the quarantine station, with respect to their sanitary condition and that of their passengers, shall pay the compensation which the law fixes for this service.

This compensation is called a tonnage tax, forbidden by the Constitution of the United States; a regulation of commerce exclusively within the power of Congress; and also a regulation which gives a preference to the port of New Orleans over ports of other States.

These are grave allegations with regard to the exercise of a power which, in all countries and in all the ports of the United States, has been considered to be a part of, and incident to, the power to establish quarantine.

We must examine into this proposition and see if anything in the Constitution sustains it. Is this requirement that each vessel shall pay the officer who examines it a fixed compensation for that service a tax? A tax is defined to be "a contribution imposed by government on individuals for the service of the State." It is argued that a part of these fees go into the treasury of the State or of the city, and it is therefore levied as part of the revenue of the State or city and for that purpose. But an examination of the statute shows that the excess of the fees of this officer over his salary is paid into the city treasury to constitute a fund wholly devoted to quarantine expenses, and that no part of it ever goes to defray the expenses of the State or city government.

That the vessel itself has the primary and deepest interest in this examination it is easy to see. It is obviously to her interest, in the pursuit of her business, that she enter the city and depart from it free from the suspicion which, at certain times, attaches to all vessels coming from the Gulf. This she obtains by the examination and can obtain in no other way. If the law did not make this provision for ascertaining her freedom from infection, it would be compelled to enact more stringent and more expensive penalties against the vessel herself, when it was found that she had come to the city from an infected port or had brought contagious persons or contagious matter with her; and throwing the responsibility for this on the vessel, the heaviest punishment would be necessary by fine and imprisonment for any neglect of the duty thus imposed. The State now says you must submit to this examination. If you appear free of objection, you are relieved by the officer's cer-

tificate of all responsibility on that subject. If you are in a condition dangerous to the public health, you are quarantined and relieved in this manner. For this examination and fumigation you must pay. The danger comes from you, and though it may turn out that in your case there *is* no danger, yet as you belong to a class from which all this kind of injury comes, you must pay for the examination which distinguishes you from others of that class. It seems to us that this is much more clearly a fair charge against the vessel than that of half pilotage, where the pilot's services are declined, and where all the pilot has done is to offer himself. This latter has been so repeatedly held to be a valid charge, though made under State laws, as to need no citations to sustain it.

In all cases of this kind it has been repeatedly held that, when the question is raised whether the State statute is a just exercise of State power or is intended by roundabout means to invade the domain of Federal authority, this court will look into the operation and effect of the statute to discern its purpose. See *Henderson* v. *Mayor of New York*, 92 U. S. 259; *Chy Lung* v. *Freeman*, 92 U. S. 275; *Cannon* v. *New Orleans*, 20 Wall. 587.

In the case of *Packet Co.* v. *St. Louis*, 100 U. S. 423, where a city wharfage tax was assailed on the same ground as the fee in the present case, the court said the fee was a fair equivalent for the use of the wharf. "Nor is there any ground whatever to suppose that these wharfage fees were exacted for the purpose of increasing the general revenue of the city beyond what was necessary to meet its outlay, from time to time, in maintaining its wharves in such condition as the immense business of that locality required." So here, there is no reason to suppose that these fees had any other purpose or destination than to keep up and pay the expenses of the quarantine station and system.

But, conceding it to be a tax, in what sense can it be called a tonnage tax? The cases of *State Tonnage Tax*, 12 Wall. 204; *Peete* v. *Morgan*, 19 Wall. 581; *Cannon* v. *New Orleans*, 20 Wall. 577; *Inman Steamship Co.* v. *Tinker*, 94 U. S. 238, are all cited and relied on to show that this is a tonnage tax. But

in all these cases the contribution exacted was measured by the tonnage of the vessel in express terms; and the decision of the court rested on that fact. In the first of them it was admitted that the statute of Alabama would have been valid as a tax on property within the State, but for the single fact that the amount of it was measured by the tonnage of the vessel.

In *Peete's Case* the tax was for every vessel arriving at a quarantine station, whether any service was rendered or not, $5 for the first hundred tons of her capacity, and one and a half cents for every additional ton, and this mode of measuring the tax was held to make it a tonnage tax.

The same fact was presented in *Cannon* v. *New Orleans*, though it was called a wharfage tax. The court, however, held it to be a tax for the privilege of landing in the port, whether the vessel used a wharf or not, and for this reason, and because the amount of it was measured by the vessel's tonnage, it was held void.

In the case of *Steamship* v. *Port Wardens*, 6 Wall. 31, the court held a fee payable to the port wardens by every vessel which entered the port, whether it received any service or not, to be void as a regulation of commerce and as contravening the policy of the prohibition of a tonnage tax by the States. But in almost all the cases relied on by the appellants there was a reference to the tonnage capacity of the vessel as the measure of the tax, and in all of them there was an absence of any service rendered for which the contribution was a compensation; generally they were held to be imposed for the privilege of entering and anchoring in the port.

In the present case we are of opinion that the fee complained of is not a tonnage tax, that, in fact, it is not a tax within the true meaning of that word as used in the Constitution, but is a compensation for a service rendered, as part of the quarantine system of all countries, to the vessel which receives the certificate that declares it free from further quarantine requirements.

Is the law under consideration void as a regulation of commerce? Undoubtedly it is in some sense a regulation of commerce. It arrests a vessel on a voyage which may have been a long one. It may affect commerce among the States when

the vessel is coming from some other State of the Union than Louisiana, and it may affect commerce with foreign nations when the vessel arrested comes from a foreign port. This interruption of the voyage may be for days or for weeks. It extends to the vessel, the cargo, the officers and seamen, and the passengers. In so far as it provides a rule by which this power is exercised, it cannot be denied that it regulates commerce. We do not think it necessary to enter into the inquiry whether, notwithstanding this, it is to be classed among those police powers which were retained by the States as exclusively their own, and, therefore, not ceded to Congress. For, while it may be a police power in the sense that all provisions for the health, comfort, and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, even where such powers are so exercised as to come within the domain of Federal authority as defined by the Constitution, the latter must prevail. *Gibbons* v. *Ogden*, 9 Wheat. 1, 210; *Henderson* v. *The Mayor*, 92 U. S. 259, 272; *New Orleans Gas Co.* v. *Louisiana Light Co.*, 115 U. S. 650, 661.

But it may be conceded that whenever Congress shall undertake to provide for the commercial cities of the United States a general system of quarantine, or shall confide the execution of the details of such a system to a National Board of Health, or to local boards, as may be found expedient, all State laws on the subject will be abrogated, at least so far as the two are inconsistent. But, until this is done, the laws of the State on the subject are valid. This follows from two reasons:

1. The act of 1799, the main features of which are embodied in Title LVIII. of the Revised Statutes, clearly recognizes the quarantine laws of the States, and requires of the officers of the Treasury a conformity to their provisions in dealing with vessels affected by the quarantine system. And this very clearly has relation to laws created after the passage of that statute, as well as to those then in existence; and when by the act of April 29, 1878, 20 Stat. 37, certain powers in this direction were conferred on the Surgeon-General of the Marine Hospital Service, and consuls and revenue officers were required to

contribute services in preventing the importation of disease, it was provided that "there shall be no interference in any manner with any quarantine laws or regulations as they now exist or may hereafter be adopted under State laws," showing very clearly the intention of Congress to adopt these laws, or to recognize the power of the States to pass them.

2. But, aside from this, quarantine laws belong to that class of State legislation which, whether passed with intent to regulate commerce or not, must be admitted to have that effect, and which are valid until displaced or contravened by some legislation of Congress.

The matter is one in which the rules that should govern it may in many respects be different in different localities, and for that reason be better understood and more wisely established by the local authorities. The practice which should control a quarantine station on the Mississippi River, a hundred miles from the sea, may be widely and wisely different from that which is best for the harbor of New York. In this respect the case falls within the principle which governed the cases of *Willson* v. *Blackbird Creek Marsh Co.*, 2 Pet. 245; *Cooley* v. *The Board of Wardens*, 12 How. 299; *Gilman* v. *Philadelphia*, 3 Wall. 713, 727; *Pound* v. *Turk*, 95 U. S. 459, 462; *Hall* v. *DeCuir*, 95 U. S. 485, 488; *Packet Co.* v. *Catlettsburg*, 105 U. S. 559, 562; *Transportation Co.* v. *Parkersburg*, 107 U. S. 691, 702; *Escanaba Co.* v. *Chicago*, 107 U. S. 678.

This principle has been so often considered in this court that extended comment on it here is not needed. Quarantine laws are so analogous in most of their features to pilotage laws in their relation to commerce that no reason can be seen why the same principle should not apply. In one of the latest of the cases cited above, the town of Catlettsburg, on the Ohio River, had enacted that no vessel should, without permission of the wharfmaster, land at any other point on the bank of the river within the town than a space designated by the ordinance. This court said, "that, if this be a regulation of commerce under the power conferred on Congress by the Constitution, that body has signally failed to provide any such regulation. It belongs, also, manifestly to that class of rules which, like pilotage and

some others, can be most wisely exercised by local authorities, and in regard to which no general rules applicable alike to all ports and landing places can be properly made. If a regulation of commerce at all, it comes within that class in which the States may prescribe rules until Congress assumes to do so."

For the period of nearly a century since the government was organized Congress has passed no quarantine law, nor any other law to protect the inhabitants of the United States against the invasion of contagious and infectious diseases from abroad; and yet during the early part of the present century, for many years the cities of the Atlantic coast, from Boston and New York to Charleston, were devastated by the yellow fever. In later times the cholera has made similar invasions; and the yellow fever has been unchecked in its fearful course in the Southern cities, New Orleans especially, for several generations. During all this time the Congress of the United States never attempted to exercise this or any other power to protect the people from the ravages of these dreadful diseases. No doubt they believed that the power to do this belonged to the States. Or, if it ever occurred to any of its members that Congress might do something in that way, they probably believed that what ought to be done could be better and more wisely done by the authorities of the States who were familiar with the matter.

But to be told now that the requirement of a vessel charged with contagion, or just from an infected city, to submit to examination and pay the cost of it is forbidden by the Constitution because only Congress can do that, is a strong reproach upon the wisdom of a hundred years past, or an overstrained construction of the Constitution.

It is said that the charge to the vessel for the officer's service in examining her is not a necessary part of quarantine system. It has always been held to be a part in all other countries, and in all quarantine stations in the United States. No reason is perceived for selecting this item from the general system and calling it a regulation of commerce, while the remainder is not. If the arrest of the vessel, the detention of its passengers, the cleansing process it is ordered to go through

with, are less important as regulations of commerce than the exaction of the examination fee, it is not easily to be seen.

We think the proposition untenable.

There remains to be considered the objection that the law is forbidden by paragraph six of section nine of the first article of the Constitution, which declares that "no preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another."

It is not readily perceived how this quarantine statute of Louisiana, and particularly the fees of the quarantine officers, do give such a preference. Are the ports of Louisiana given a preference over ports of other States? Are the ports of any other State given a preference over those of Louisiana? Or are the ports of other States given a preference as among themselves. Nothing of this is pointed out.

The eighth section of this first article of the Constitution is devoted exclusively to defining the powers conferred on Congress.

The ninth section, including the above paragraph, is in like manner devoted to restraints upon the power of Congress and of the National Government; and the tenth section contains only restraints upon the powers of the States, by declaring what they shall not do. The most casual inspection shows this, and the clause of the Constitution here relied on is not found among the restrictions of the States, but among those imposed upon the Federal Government. As the matter under discussion is the validity of the statute of Louisiana, it is unaffected by the constitutional provision alluded to. Woodbury, J., in *Passenger Cases*, 7 How. 283, 541; *The Brig Wilson* v. *United States*, 1 Brock. 423, 432; *Butler* v. *Hopper*, 1 Wash. C. C. 499; *Pennsylvania* v. *Wheeling Bridge Co.*, 18 How. 421, 435; *Munn* v. *Illinois*, 94 U. S. 113, 135.

We see no error in the judgment of the Supreme Court of Louisiana, and it is

*Affirmed.*

MR. JUSTICE BRADLEY dissented.