TV PIX, INC., a corporation, Plaintiff,

v.

Reese H. TAYLOR, Jr., Noel A. Clark and Evo A. Granata, Commissioners of the Public Service Commission of the State of Nevada, Defendants.

WELLS TV, INC., a corporation, Plaintiff,

v.

Reese H. TAYLOR, Jr., Noel A. Clark and Evo A. Granata, Commissioners of the Public Service Commission of the State of Nevada, Defendants.

Civ. Nos. 1814, 1827.

United States District Court
D. Nevada.

Dec. 2, 1968.

Paul A. Richards, Reno, Nev., McMillan and Browning, Salt Lake City, Utah, for plaintiffs.

Harvey Dickerson, Atty. Gen. of Nevada, for defendants.

Before MERRILL, Circuit Judge, FOLEY and THOMPSON, District Judges.

## OPINION

THOMPSON, District Judge:

This three judge court was convened to consider the constitutionality of an act of the Legislature of the State of Nevada which unambiguously and unequivocally purposes to regulate as public utilities the community antenna television companies in this State.

In the classic mode of utility regulation, the Nevada statute declares community antenna television companies to be public utilities [N.R.S. 704.020(1) (g)], requires a certificate of public convenience and necessity [N.R.S. 704.330, 711.090, 711.100, 711.130], requires just and reasonable rates under supervision of the Public Service Commission [N.R.S. 704.040 et seq.], compels safe and adequate service and facilities [N.R.S. 711.-150], and other incidental requirements [Nevada Community Antenna Television System Law, 1967 St. 1231 et seq.; N.R.S. 711.010 et seq.].

The facts are not in dispute. Plaintiff, TV Pix, Inc., owns and operates community antenna systems in Elko, Carson City and Stateline, Nevada. Plaintiff, Wells TV, Inc., owns and operates a community antenna system in Wells. TV Pix, Inc. owns and maintains certain reception equipment on Spruce Mountain in the State of Nevada by which it receives off-air the signals of the three commercial television stations in Salt Lake City. The signals received by its equipment are delivered by it to a federally regulated common carrier, Trans-American Microwave, Inc., and are transmitted by microwave equipment from the original reception point to the distribution center of plaintiff's systems in Elko and Wells. From such distribution centers, or head-ends, as they are sometimes referred to in the industry, the signals are distributed by means of coaxial cable, signal amplifiers and drop-lines to subscribers to the plaintiffs' services in these communities. Subscribers in Wells and Elko pay to the plaintiff a connection fee and a monthly service fee for the communications services rendered.

Plaintiff TV Pix, Inc. has a separate array of reception and antenna equipment located at Freel Peak in California. Such equipment picks up the signals of Stations KTVU, Oakland; KPIX, San Francisco; KVIE, Sacramento; KGO, San Francisco; KCRA, Sacramento; and KOVR, Sacramento. The signals are delivered from the plaintiff's reception equipment to microwave transmitting equipment owned by a common carrier licensed by the FCC, which transmits such signals to the distribution points of the TV Pix, Inc. CATV systems in Carson City, Nevada and in Tahoe, California. The signals are distributed in Carson City by a series of cables, amplifiers and drop-lines to the plaintiff's customers. A single community antenna system serves both Stateline, Nevada and the Tahoe-Bijou area of California. The distribution point for this system is located within the State of California.

Plaintiff's systems in Carson City and and in the Stateline-Bijou area also de-

liver to their subscribers the signals of KOLO and KCRL, Reno. The Reno signals are picked up within the State of Nevada for delivery to the Carson City subscribers. The pick-up point is in California for the system delivering the signals to Stateline-Bijou residents.

It is uncontradicted that the reasonable replacement costs of the various systems owned and operated by the plaintiffs in the State of Nevada greatly exceed the sum of $10,000. The values placed upon these systems by the evidence are as follows:

| | | | |
|---|---|---|---|
| Wells | $ 47,500 | Elko | $125,000 |
| Carson City | 136,000 | Stateline | 95,000 |

The plaintiffs operate their systems in the Nevada communities pursuant to the contracts and proprietary rights which they have acquired from the owners of the rights of way and telephone poles involved in their business. The City of Elko, for example, has granted to TV Pix, Inc. the right to use its streets, ways, alleys and places within the corporate limits of the City for lines, wires and coaxial cables for the distribution of television and radio signals (Stipulation of Facts, Exhibit 1). Plaintiff has agreed to pay to the City for the rights obtained two per cent of its gross annual receipts arising from the antenna service furnished to its subscribers. The City recited that in granting the rights to the plaintiff, it "is in no way undertaking to supervise or police the business of the grantee nor is the city guaranteeing television reception or the degree of any signal to the residents or any resident of the city * * *" (Exhibit A, p. 4, sec. 10). The plaintiff is required, however, to construct its lines in accordance with the provisions of the National Electric Code (Ibid. sec. 11(a)). TV Pix, Inc. has an agreement with California Pacific Utilities Company relating to the use of telephone poles in Elko (Stipulation of Facts, Exhibit B). It pays a fee to the company based upon the number of poles it uses in the communications services it renders (Ibid. p. 6). Similar arrangements are made with Carson City and Wells for the use of the public streets and the telephone and power companies owning the poles in those communities. Inasmuch as there was no incorporated City at Stateline, no rights were obtained other than from the owners of the utility poles in the area to which the plaintiff's cables were attached.

Plaintiffs pose a three pronged attack against Nevada's proposed regulation of their businesses: That the statute imposes an unconstitutional burden on interstate commerce; that Congress has preempted the field of television communications; and that the statute deprives plaintiffs of their property without due process of law.

In two recent cases, United States v. Southwestern Cable Co., 1968, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001, and Fortnightly Corp. v. United Artists, 1968, 392 U.S. 390, 88 S.Ct. 2084, 20 L.Ed.2d 1176, the Supreme Court has thoroughly described the operations and activities of community antenna companies consistently with the conduct of plaintiff companies in the instant case. There is no doubt that plaintiffs are engaged in interstate commerce. "Nor can we doubt that CATV systems are engaged in interstate communication, even where, as here, the intercepted signals emanate from stations located within the same State in which the CATV system operates. We may take notice that television broadcasting consists in very large part of programming devised for, and distributed to, national audiences; respondents thus are ordinarily employed in the simultaneous retransmission of communications that have very often originated in other States. The stream of communication is essentially

uninterrupted and properly indivisible. To categorize respondents' activities as intrastate would disregard the character of the television industry, and serve merely to prevent the national regulation that 'is not only appropriate but essential to the efficient use of radio facilities.' Federal Radio Comm'n v. Nelson Bros. Co., 289 U.S. 266, 279 [53 S.Ct. 627, 77 L.Ed. 1166]." United States v. Southwestern Cable Co., *supra*.

The pristine constitutional issue presented under the commerce clause of the Constitution is whether state regulation as a public utility of a business engaged in interstate commerce is forbidden by the commerce clause itself, regardless of action or inaction by the Congress in implementation of its powers. Plaintiffs argue that the State has no power to prohibit a person from engaging in interstate commerce and that a state statute, which requires a certificate of public convenience and necessity, must fall as an unconstitutional obstruction of commerce. Our review of the authorities does not support this conclusion.

In Gibbons v. Ogden, 1824, 9 Wheat. 1, 6 L.Ed. 23, the Court held that New York legislation, which purported to exclude from the navigable waters of the State vessels licensed under an Act of Congress unless also licensed by state authority was void, but subsequent decisions pioneered by Cooley v. Board of Wardens, 1851, 12 How. 299, 13 L.Ed. 996, have clarified the broad language of Chief Justice Marshall in the *Gibbons* case, leading the Court in Olsen v. Smith, 1904, 195 U.S. 332, 341, 25 S.Ct. 52, 53, 49 L.Ed. 224, to state the following positive expression of the principle:

"The first contention in effect is that the state was without power to legislate concerning pilotage, because any enactment on that subject is necessarily a regulation of commerce within the provision of the Constitution of the United States. The unsoundness of this contention is demonstrated by the previous decisions of this court, since it has long since been settled that even although state laws concerning pilotage are regulations of commerce, 'they fall within that class of powers which may be exercised by the states until Congress has seen fit to act 'upon the subject.' Cooley v. Board of Wardens, 12 How. 299 [13 L.Ed. 996]; Ex parte McNiel, 13 Wall. 236 [20 L.Ed. 624]; Wilson v. McNamee, 102 U.S. 572 [26 L.Ed. 234]."

Nevertheless, in Buck v. Kuykendall, 1925, 267 U.S. 307, 45 S.Ct. 324, 69 L.Ed. 623, and the companion case, Bush & Sons Co. v. Maloy, 1925, 267 U.S. 317, 45 S.Ct. 326, 69 L.Ed. 627, the Court voided a Washington public utility regulation of motor truck common carriers in the one case and a similar Maryland statute in the other, stating in the *Buck* case: "Thus the provision of the Washington statute is a regulation, not of the use of its own highways, but of interstate commerce. Its effect upon such commerce is not merely to burden, but to obstruct it. Such state action is forbidden by the commerce clause." And in the *Maloy* case: "The state action in the *Buck Case* was held to be unconstitutional, not because the statute prescribed an arbitrary test for the granting of permits, or because the director of public works had exercised the power conferred arbitrarily or unreasonably, but because the statute as construed and applied invaded a field reserved by the commerce clause for federal regulation." These cases have not been overruled. Unquestionably, there is an area where the Commerce Clause of the Constitution is in a sense self-executing; that is to say, state legislation of a certain kind in certain circumstances is abjured by the Constitution itself, regardless of whether Congress has acted. The pertinent circumstances in the *Buck* and *Maloy* cases were that both applicants for certificates of public convenience proposed to engage solely in interstate commerce as common carriers and the refusal of state permits prevented the interstate activity.

In the field of motor carrier regulation, the impact of *Buck* and *Maloy* has been lessened by subsequent decisions, the import of which is that each case

should be viewed on its own facts for a determination of whether the state requirements in fact unreasonably obstruct and impede interstate commerce. See, Interstate Busses v. Holyoke Ry. 1927, 273 U.S. 45, 51, 47 S.Ct. 298, 299, 71 L. Ed. 530 ("The burden is upon appellant to show that enforcement of the Act operates to prejudice interstate carriage of passengers."); Eichholz v. Public Service Comm., 1939, 306 U.S. 268, 59 S.Ct. 532, 83 L.Ed. 641 ("But in the absence of the exercise of federal authority, and in the light of local exigencies, the State is free to act in order to protect its legitimate interests even though interstate commerce is directly affected.")

■■ While the community antenna television business is in interstate commerce and is an integral part of interstate commerce (United States v. Southwestern Cable Co., *supra*), it constitutes the last stage of the interstate transmission of the television signals. It is one continuous interstate transmission to the viewer's television set, but the apparatus of the community antenna system is an appendage to the primary interstate broadcasting facilities with incidents much more local than national, involving cable equipment through the public streets and ways, local franchises, local intra-state advertising and selling of services and local intra-state collections. In this perspective, a community antenna system is essentially a local business and, in its impact on interstate commerce, is analogous to a local express or parcel delivery service or a local pilotage or lighter service organized to facilitate the final interstate delivery of goods to the named consignee. Appropriate state regulation of such primarily local facilities or services in interest commerce, in the absence of federal legislative intervention, is not proscribed by the Commerce Clause of the Constitution. Cooley v. Board of Wardens, 1851, 12 How. 299, 13 L.Ed. 996; Olsen v. Smith, 1904, 195 U.S. 332, 25 S.Ct. 52, 49 L.Ed. 224; Morgans Steamship Company v. Louisiana Board of Health, 1886, 118 U.S. 455, 6 S.Ct. 1114, 30 L.Ed. 237; Kelly v. Washington, 1937, 302 U.S. 1, 58 S.Ct. 87, 82 L.Ed. 3; Eichholz v. Public Service Comm., 1939, 306 U.S. 268, 59 S.Ct. 532, 83 L.Ed. 641. We do not view the subjects of regulation contemplated by the Nevada statute, i. e., the quality of and the rates and charges for community antenna service, as being of the character demanding national uniformity so that state action is entirely inadmissible. On the contrary, these are subjects which lend themselves naturally to local control and supervision. National uniformity is probably not a possibility, let alone an acceptable ideal.

We note that the grandfather clause of the Nevada Community Antenna Television System Law (N.R.S. 711.100) [1] qualifies plaintiffs automatically for

1. "711.100 Issuance of certificates of public convenience and necessity to certain existing CATV companies; conditions; determination of untimely applications.
  "1. If application is made to the commission within 90 days after July 1, 1967, or within 90 days after the final determination of any action or proceeding brought to contest the constitutionality of chapter 704 of NRS as applied to CATV companies which is pending on July 1, 1967, or which is commenced within 90 days after July 1, 1967, the commission shall issue a certificate of public convenience and necessity to any CATV company lawfully engaged in the construction, extension or operation of its CATV system on April 20, 1967, for the construction, extension or operation then being conducted, without requiring proof that public convenience and necessity will be served by such construction, extension of operation and without further proceedings.
  "2. The construction, extension or operation of such a CATV system may be lawfully continued pending the filing of such an application and its disposition unless the commission orders otherwise.
  "3. An application for such a certificate which is untimely shall be determined in accordance with the procedure prescribed in chapter 704 of NRS and such certificate shall be issued or refused accordingly."

certificates of public convenience and necessity upon proper and timely application.

Plaintiffs' attack is directed against the statute as it was enacted. Our holding that it does not per se unreasonably burden or obstruct interstate commerce does not carry the implication that orders issued by the Public Service Commission of Nevada, in presumed administration or enforcement of the Act, may not at some time in the future justifiably provoke a complaint under the Commerce Clause. Cf. Eichholz v. Public Service Comm., *supra*.

In reaching our conclusion, we have given weight to the established rule that in the absence of Congressional occupation of the field, state action in implementation of its concurrent jurisdiction over matters affecting interstate commerce, the subject not being one demanding uniformity of regulation, is presumptively constitutional and the burden is on the plaintiff to prove the substantial adverse burden, obstruction or prejudice to commerce among the states resulting from the state statute or regulation under attack. See: Davis v. Department of Labor, 1942, 317 U.S. 249 at 257, n. 5, 63 S.Ct. 225, 87 L.Ed. 246.

Plaintiffs also contend for federal preemption, relying upon the Supremacy Clause of the Constitution and the provisions of the Communications Act of 1934, 47 U.S.C. § 151 et seq., and the regulations promulgated thereunder.

The governing principle is stated in Head v. New Mexico Board, 1963, 374 U.S. 424, 83 S.Ct. 1759, 10 L.Ed.2d 983:

"In dealing with the contention that New Mexico's jurisdiction to regulate radio advertising has been preempted by the Federal Communications Act, we may begin by noting that the validity of this claim cannot be judged by reference to broad statements about the 'comprehensive' nature of federal regulation under the Federal Communications Act. '[T]he "question whether Congress and its commissions acting under it have so far exercised the ex-

clusive jurisdiction that belongs to it as to exclude the State, must be answered by a judgment upon the particular case." Statements concerning the "exclusive jurisdiction" of Congress beg the only controversial question: whether Congress intended to make its jurisdiction exclusive.' California v. Zook, 336 U.S. 725, 731 [69 S.Ct. 841, 844, 93 L.Ed. 1005]. Kelly v. Washington [ex rel. Foss Co.], 302 U.S. 1, 10–13 [58 S.Ct. 87, 82 L.Ed. 3]. In areas of the law not inherently requiring national uniformity, our decisions are clear in requiring that state statutes, otherwise valid, must be upheld unless there is found 'such actual conflict between the two schemes of regulation that both cannot stand in the same area, [or] evidence of a congressional design to preempt the field.' Florida [Lime &] Avocado Growers v. Paul, 373 U.S. 132, 141 [83 S.Ct. 1210, 1217, 10 L.Ed.2d 248]."

In our discussion of the interstate commerce problem, we have already concluded that state public utility regulation of community antenna companies is not an area of the law inherently requiring national uniformity. It is settled that Congress, in enacting the Federal Communications Act of 1934, did not intend absolute preemption of the field to the exclusion of all state regulation. Head v. New Mexico Board, *supra*, p. 431, 83 S.Ct. p. 1764:

"The nature of the regulatory power given to the federal agency convinces us that Congress could not have intended its grant of authority to supplant all the detailed state regulation of professional advertising practices, particularly when the grant of power to the Commission was accompanied by no substantive standard other than the 'public interest, convenience, and necessity.' The Solicitor General has conceded that the power of license revocation is not a plausible substitute for state law dealing with 'traditional' torts or crimes committed through the use of radio. We can find no material difference with respect to the less 'tra-

ditional' statutory violation here involved. In the absence of positive evidence of legislative intent to the contrary, we cannot believe Congress has ousted the States from an area of such fundamentally local concern."

Finally, what Congress and the Commission have done does not show that there is such actual conflict between federal action and the Nevada law that both cannot stand. In our conception, we are talking about two things, (1) whether the breadth of the Congressional delegation of legislative power to the federal agency encompassed power to regulate all aspects of the community antenna business, and (2) whether it included a delegation of the power to preempt or not to preempt, within the discretion of the agency.

■ The Supreme Court, in United States v. Southwestern Cable Co., *supra*, has opted for a broad extensive delegation of power, saying: "We have found no reason to believe that § 152 does not, as its terms suggest, confer regulatory authority over 'all interstate * * * communication by wire or radio'" (392 U.S. at 173, 88 S.Ct. at 2003), but has reserved the question here posed.[2] Despite the fact that community antenna companies are not common carriers (392 U.S. 157, at 169, n. 29, 88 S.Ct. 1994), it is conceivable that some day a case may be made for the validity of FCC public utility type regulation of community antenna companies as reasonably necessary to meet the broad responsibilities delegated to it "to make available * * * to

all the people of the United States a rapid, efficient, Nation-wide and world-wide wire and radio communication service." 47 U.S.C. § 151. This we need not decide, for we view the Federal Communications Act as the kind of legislation where Congress has delegated to the executive agency not only the power to regulate in a certain broad area of national interest but the power of supersession as well. The dynamic rapidly changing technology of radio and television broadcasting is ill-suited to specific Congressional guidelines to regulatory authority. The need for the greatest flexibility commands the desirability of vesting in the Commission the power of Congress to preempt or not to preempt areas of control which might otherwise be invaded by the states. Thus, whether preemption has in fact occurred, invalidating the Nevada Community Antenna Television System Law under the Supremacy Clause of the Constitution, depends on whether the Federal Communications Commission has, in fact, regulated in this area and not upon whether it has the power to do so. The state statute "at least so long as any power the (Commission) may have remains 'dormant and unexercised'", is valid and constitutional. Head v. New Mexico Board, *supra*, 374 U.S. at 432, 83 S.Ct. at 1764; Colorado Anti-Discrimination Comm. v. Continental, 1963, 372 U.S. 714, 724, 83 S.Ct. 1022, 10 L.Ed.2d 84; Bethlehem Steel Co. v. New York State Labor Relations Board, 1947, 330 U.S. 767, 775, 67 S.Ct. 1026, 91 L.Ed. 1234; Parker v. Brown, 1943, 317 U.S. 341, 353, 63 S.Ct. 307, 87 L.Ed. 315.[3]

2. "There is no need here to determine in detail the limits of the Commission's authority to regulate CATV. It is enough to emphasize that the authority which we recognize today under § 152(a) is restricted to that reasonably ancillary to the effective performance of the Commission's various responsibilities for the regulation of television broadcasting. The Commission may, for these purposes, issue 'such rules and regulations and prescribe such restrictions and conditions, not inconsistent with law,' as 'public convenience, interest, or necessity requires.' 47 U.S.C. § 303(r). We express no views as to the

Commission's authority, if any, to regulate CATV under any other circumstances or for any other purposes."

3. "We may assume that the powers conferred upon the Secretary would extend to the control of surpluses in the raisin industry through a pooling arrangement such as was promulgated under the California Prorate Act in the present case. See United States v. Rock Royal Co-op., 307 U.S. 533 [59 S.Ct. 993, 83 L.Ed. 1446]; Currin v. Wallace [306 U.S. 1, 59 S.Ct. 379, 83 L.Ed. 441], supra. We may assume also that a stabiliza-

The answer to the question of whether the Nevada Community Antenna Television System Law does in fact conflict with federal regulation of community antenna companies is clear. To date, as related in the *Southwestern Cable Co.* case, the FCC has imposed its will on community antenna companies in but three limited areas. United States v. Southwestern Cable Co., 392 U.S. 157, at 164–167, 88 S.Ct. 1994. Not only has the FCC failed to promulgate regulations concerning rates, quality of service and franchises of community antenna companies, it has, through the years, sought to eschew legislative authority in this area.[4]

Defendants cite this as an agency construction of an Act of Congress entitled to be accorded "great weight" by the Courts. Cf. United States v. American Trucking Associates, Inc., 1940, 310 U.S. 534 at 549, 60 S.Ct. 1059, 84 L.Ed. 1345. Logically, such an interpretation, if accepted by the Courts, congeals the scope of the Act until a Congressional amendment. In view of the fluid authority intended and required to be vested in the Commission to cope with changing condi-

tions in the industry as they present themselves, we prefer to view these pronouncements of the FCC only as irrefutable evidence of the absence of present intent to regulate and preempt state authority in the field of CATV franchises, rates and service.

Plaintiff also argues that the Fourteenth Amendment precludes legislation like the Nevada Community Antenna Television System Law. The contention is that Nevada cannot control the service and cannot protect plaintiffs from indiscriminate and destructive competition and that to restrict plaintiffs by regulation in these circumstances violates due process of law. We do not question that regulation of companies as public utilities seeks not only to protect the public interest in the quality and cost of essential services but also to avoid disruption of such services by destructive competition. If the business in question is so non-monopolistic in character that the state cannot protect it from destructive competition, a due process problem may well be posed. This is not such a case. It is true that the quality of the television signal received by the CATV

---

tion program adopted under the Agricultural Marketing Agreement Act would supersede the state act. But the federal act becomes effective only if a program is ordered by the Secretary. Section 8c(3) provides that whenever the Secretary of Agriculture 'has reason to believe' that the issuance of an order will tend to effectuate the declared policy of the Act with respect to any commodity, he shall give due notice of an opportunity for a hearing upon a proposed order, and § 8c(4) provides that after the hearing he shall issue an order if he finds and sets forth in the order that its issuance will tend to effectuate the declared policy of the Act with respect to the commodity in question. Since the Secretary has not given notice of hearing and has not proposed or promulgated any order regulating raisins, it must be taken that he has no reason to believe that issuance of an order will tend to effectuate the policy of the act." Parker v. Brown, 1943, 317 U.S. 341, at 353, 63 S.Ct. 307, at 314.

4. See Notice of Inquiry and Notice of Proposed Rule Making, April 22, 1965, Docket No. 15971, 1 FCC 2d 453, paragraph 32:
"Third, in the event that it is ultimately determined that the Commission has jurisdiction over all CATV systems, we do not contemplate regulation of such matters as CATV rates to subscribers, the extent of the service to be provided, or the award of CATV franchises. Apart from the areas in which the Commission has specifically indicated concern and until such time as regulatory measures are proposed, no Federal preemption is intended. Rather, we view our role as one of cooperating with local franchising authorities, and State regulatory commissions to the maximum extent possible, such as by making information available to them, consulting with respect to technical standards for CATV operations, etc."
Also see legislative history referenced in United States v. Southwestern Cable Co., *supra*.

subscribers depends in part upon the quality of the microwave transmission which is out of the reach of the Nevada regulatory authority. It does not follow, however, that there are not local problems of safety and quality in the local installations which are properly of state concern. These may be supervised without infringement upon the area of federal control. It is also true that the FCC may license one or more new live television broadcasting stations in the area of a CATV state franchise. But it is not apparent as yet that CATV companies are actually competitive with live broadcasters. Characteristically they do not produce their own programming. 392 U.S. 162, 88 S.Ct. 1994. They are parasites on the national network of television broadcasters dependent on the live broadcasts for their existence. CATV systems are beneficent parasites for without them millions of viewers would suffer from lack of or poor quality of service and reception. Nevertheless, in their present mode of operation, they supplement and do not compete with live broadcasts, and the State of Nevada does have the power to protect the monopoly of their local TV service against other incipient CATV companies seeking a share of the market. The possibility has been indicated that CATV, may, in the years to come, become destructively competitive with live broadcasting. If this should occur, it may bring about more thorough federal regulation of community antenna companies to the exclusion of state regulatory bodies. As the facts appear from the record before us and the controlling precedents, there is no reason to conclude that community antenna service is not monopolistic in character and is not affected with the public interest. State supervision of it as a public utility does not conflict with the Fourteenth Amendment.

Accordingly, judgment will be entered for defendants upon submission by them of an appropriate order.