381 A.2d 859

The BOROUGH OF SCOTTDALE, a Municipal Corporation

v.

NATIONAL CABLE TELEVISION CORPORATION and Jay L. Sedwick, Appellants.

Supreme Court of Pennsylvania.

Argued Sept. 26, 1977.

Decided Dec. 23, 1977.

Rehearing Denied Feb. 8, 1978.

48

George J. Barco, Yolanda G. Barco, Barco & Barco, Meadville, for appellants.

Joseph A. Hudock, Greensburg, for appellee.

Before EAGEN, C. J., and O'BRIEN, ROBERTS, POMEROY, NIX, MANDERINO and PACKEL, JJ.

## OPINION

PACKEL, Justice.

The appellant, a cable television company, seeks reversal because the court of common pleas and the Commonwealth Court have upheld a provision in an ordinance which prohibited the Company from increasing its charges to the people in the community, without approval of the appellee Borough. Although the Borough has denied three requests to increase the charges, fixed more than eight years ago, the parties have stipulated as follows:

"13. It is stipulated that the primary issue involved in this case is whether or not the Borough of Scottdale has the legal authority to insist upon prior approval for any increase or revision in the service charges as set forth in Section 4(c) of the aforesaid Ordinance."

No factual issue has been raised by the record or by the questions presented to this Court as to the unreasonableness of any action of the Borough.

The Borough initiated the litigation by a complaint in equity to restrain the Company from increasing its charges without prior approval of the Borough. After preliminary objections, a stipulation of the parties, an opinion, an amended opinion as to a permanent injunction, exceptions filed and

argued and the entry of a final order, the Company was enjoined from increasing its charges without the prior approval of the Borough.

The basic issue, as the parties have stipulated, refers to the legal authority of the Borough to insist upon approval of any increase in charges. A proper analysis of the legal question calls for a brief examination of the history of cable television and its public regulation.[1]

In the past quarter century cable television has developed to an important position in our present-day economy.[2] Its early growth as an unregulated industry commenced in small communities throughout the nation. The original concept was of a high antenna receiving unit on a mountain peak or other high place, coupled by transformers, amplifiers and transmission and distribution cables to homes in the vicinity.[3] Through an evolutionary process the industry has come to large cities where, through the use of high towers and other developments in distribution, signals can be picked up and carried by microwave and cable to customers hundreds of miles away. The potential of cable television companies has vastly increased because of the use of the systems not only to carry programs picked up out of the air, but also to carry programs which the companies originate. This is referred to as cablecasting.

The industry had little or no regulatory control at the outset. The initial problems related to the high capital investment requirements for a system and the proper techni-

1. *See* Note, *The Wire Mire: The FCC and CATV*, 89 Harv.L.Rev. 366 (1965).

2. In *United States v. Midwest Video Corp.*, 406 U.S. 649, 651, 92 S.Ct. 1860, 1862, 32 L.Ed.2d 390 (1972), the Court referred to its earlier observation that "the growth of CATV since the establishment of the first commercial system in 1950 has been nothing less than 'explosive' " and then added: "The potential of the new industry to augment communication services now available is equally phenomenal."

3. A cable television system "provides a well-located antenna with an efficient connection to the viewer's television set." *Fortnightly Corp. v. United Artists Television, Inc.*, 392 U.S. 390, 399, 88 S.Ct. 2084, 2089, 20 L.Ed.2d 1176 (1968).

cal installation and servicing of the systems.[4] The first controls came from local governments. In many a town or borough, franchises were sought for cable television systems and severe competition developed among applicants for franchises. In some states public utility commissions, by administrative construction of their statutes or by legislative amendments, began to assert jurisdiction.[5] In other places, as in Pennsylvania, cable television was deemed not to be within the statutory definition of a public utility.[6]

The jurisdiction of the federal government over cable television was not finally resolved until the decision in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 88 S.Ct. 1994, 20 L.Ed.2d 1001 (1968). That control does not relate to rates or charges made by cable television companies or any other television companies. *United States v. Radio Corporation of America*, 358 U.S. 334, 79 S.Ct. 457, 3 L.Ed.2d 354 (1959). The federal regulation over some phases of the industry does not preclude other local regulation so long as it does not unreasonably burden interstate commerce. *TV Pix, Inc. v. Taylor*, 304 F.Supp. 459 (D.Nev.1968), *aff'd*, 396 U.S. 556, 90 S.Ct. 749, 24 L.Ed.2d 746 (1970); *Lamb Enterprises, Inc. v. City of Erie*, 396 F.2d 752 (3d Cir. 1968).

As to the legality of municipal control in Pennsylvania over charges by cable television companies, the starting point is the power of the local governmental unit with respect to the use of public places, including streets, roads and highways. It is conceded that Pennsylvania municipalities do have the power and authority to grant permission for the use of public ways, *Forty-six South Fifty-second Street Corporation v. Manlin*, 398 Pa. 304, 157 A.2d 381 (1960). In *City of Farrell v. Altoona CATV*, 419 Pa. 391, 214 A.2d 231 (1965), this power was held so important that the municipali-

---

4. *See United States v. Jerrold Electronics Corp.*, 187 F.Supp. 545, 551–52 (E.D.Pa.1960), *aff'd*, 365 U.S. 567, 81 S.Ct. 755, 5 L.Ed.2d 806 (1961).

5. Annot., 61 A.L.R.3d 1150 (1975).

6. Investigation Upon Commissioner's Motions, 41 Pa.P.U.C. Decisions 381 (1964).

ty could exercise it only by ordinance and not by the informality of a resolution. The Borough Code, Act of February 1, 1966, P.L. (1965) 1656, No. 581, § 1202, 53 P.S. § 46202, by subdivision (17), specifically confers the power to regulate the use of public ways. Significantly, subdivision (74) grants the very broad power to adopt ordinances so long as they are "not inconsistent with or restrained by the Constitution and laws of this Commonwealth . . . ."

The crux of the Company's attack is upon the regulatory aspect of the Borough's ordinance. The claim is not only that it is unauthorized but also that it is unconstitutional. Taking the last point first, it comes immediately to mind that, the claim of the Company is that it is in the class of "a butcher, baker or candlestick maker" so that its charges could not be publicly regulated. Cable television companies are or tend to be monopolies, have large capital investment, purport to provide their services to the public and make use of consent, license or franchise to use public ways as an important aspect of their businesses.[7] There is no closed category of business activities affected with public interest which can be subjected to regulation as public utilities.[8] But for the local exercise of control over charges, there is no rate protection for the benefit of the consumer exercised by the federal government or by the Commonwealth. Accordingly, the constitutional argument by the appellant has no sound basis.

The alleged lack of regulatory authority can be met by the express broad authority conferred by the Borough Code provisions already referred to. Even if the authority were not express, it could be implied from the admitted

---

7. "[F]rom early times the enjoyment of a franchise or privilege for the performance of a service (whether by virtue of 'a prescription time out of mind, or a charter from the King'), of which service the public has a real and continuing need and no ready means of obtaining it otherwise, subjects the business to regulation and control in the public interest." *Hertz Drivurself v. Siggins*, 359 Pa. 25, 34, 58 A.2d 464, 470 (1948).

8. *Nebbia v. New York*, 291 U.S. 502, 536, 54 S.Ct. 505, 78 L.Ed. 940 (1934).

grant of authority with respect to the use of public ways. This Court, in *Allegheny City v. Railway*, 159 Pa. 411, 416–17, 28 A. 202, 203 (1893), long ago recognized that reasonable conditions can be attached to a grant for the use of streets:

"Nor can we see that there is anything unreasonable in these conditions, even if that matter were within our province. A valuable franchise, to use public property, the streets, for corporate profit, is about to be granted. It is not illegal or unreasonable that the public, or the city which represents it, should have a consideration for the privilege that it confers. If it were a right of passage over private property, there would be no question about it, and the right could not be got in any other way. We see no reason why the public interest should not be promoted by requiring special privileges in the public property to be paid for in the same way."

In *Philadelphia Electric Co. v. Philadelphia*, 301 Pa. 291, 300, 152 A. 23, 26 (1930), this Court spoke of the propriety of conditions imposed on the use of streets for underground conduits:

"This court has repeatedly held that if a public service corporation accepts imposed municipal conditions in consideration of the right given to construct its works, it must perform as stipulated or suffer the penalty arising from failure to do so. The kind and range of the conditions imposed by the municipality were within the discretion of its executive and administrative officers, and it has long been an established principle of law that the court, except in cases of manifest abuse of discretion, will not substitute its judgment for that of the body to whom the parties committed the right of imposing conditions (*Carlisle v. M. St. Ry. Co.'s App.*, 245 Pa. 561, 91 A. 959; *Cameron v. Carbondale*, 227 Pa. 473, 76 A. 198); and the conditions enacted, and which plaintiff accepted, were such as the city deemed proper: *Allegheny City v. Peoples' N. Gas & Pipeage Co.*, 172 Pa. 632, 33 A. 704; *Allegheny v. Millville, etc., Ry.*, supra."

Still further support for the validity of the condition can be seen in the broad contractual powers under Section 1401 of the Borough Code, 53 P.S. § 46401 which provides:

"Each borough may make contracts for lawful purposes and for the purpose of carrying into execution the provisions of this act and laws of the Commonwealth."

In *Philadelphia v. Holmes E. P. Co.*, 335 Pa. 273, 279, 6 A.2d 884, 887 (1939), this Court upheld the city's charge as a binding contractual condition allowing the use of underground wires in the streets as follows: "When such an ordinance is accepted and acted on by the grantee of the privilege the corporation becomes contractually bound to pay the consideration and perform the terms and conditions specified in the ordinance, and the contract thereby formed has the same legal status as any other contract: [citations omitted]."

The acceptance of the terms of the ordinance created a contractual relationship. The Borough, in its control over any increases in the charges, was performing an important function in protecting its residents from being subjected to uncontrolled price increases for the duration of the contract.

Courts in other jurisdictions, depending upon local law, have upheld and have denied the assertion of municipal power with respect to the charges of cable television companies.[9] Unless and until there is a valid preemptive control over such charges by the federal government or by the Commonwealth, we conclude that Pennsylvania municipalities have the legal authority to control the charges made by cable television companies. We do not have before us nor do we pass upon the issue of whether the exercise of control in this case was unreasonable or an abuse of discretion.

Order of the Commonwealth Court affirmed.

ROBERTS, J., filed a dissenting opinion.

9. Annot., 41 A.L.R.3d 384 (1972).

ROBERTS, Justice, dissenting.

The majority today holds that a Borough has authority to regulate the monthly rates charged by a private cable television company simply because cable television wires run beneath city streets, and therefore sustains an ordinance enacted by appellee, Borough of Scottdale (the Borough), requiring National Cable Television Corporation (National Cable) to submit proposed customer rate increases to the Borough for approval. Because I believe that a Borough is wholly without power to exact this requirement, I dissent.

In *Gagliardi v. Ambridge Borough*, 401 Pa. 141, 143, 163 A.2d 418, 419 (1960), this Court stated "A municipality is a creature of the state and possesses only such powers of government as are expressly granted to it and as are necessary to carry the same into effect." Accord, *Washington Arbitration Case*, 436 Pa. 168, 177, 259 A.2d 437, 442 (1969); *Wilkinsburg-Penn Joint Water Authority v. Churchill Borough*, 417 Pa. 93, 100, 207 A.2d 905, 909 (1965); *School District of Philadelphia v. Zoning Board of Adjustment*, 417 Pa. 277, 280, 207 A.2d 864, 866 (1965); *Cleaver v. Board of Adjustment*, 414 Pa. 367, 372, 200 A.2d 408, 412 (1964); *Schultz v. Philadelphia*, 385 Pa. 79, 83–4, 122 A.2d 279, 281–2 (1956); *White Oak Borough Authority Appeal*, 372 Pa. 424, 427, 93 A.2d 437, 438 (1953); *Genkinger v. New Castle*, 368 Pa. 547, 549, 84 A.2d 303, 304 (1951).

"A municipal corporation does not possess and cannot exercise any other than the following powers: (1) those granted in express words; (2) those necessarily or fairly implied in or incident to the powers expressly granted; (3) those essential to the declared objects and purposes of the corporation, not simply convenient but indispensable." *Valley Deposit and Trust Company of Belle Vernon*, 311 Pa. 495, 498, 167 A. 42, 43 (1933); accord, *Lesley v. Kite*, 192 Pa. 268, 274, 43 A. 959, 961 (1899). "Any reasonable doubt as to the existence of power is resolved by the courts against its existence in the corporation, and therefore denied." *Valley Deposit and Trust Company of Belle Vernon, supra; Lesley v. Kite, supra.*

Thus, unless the power to regulate the rates of a cable television franchise has been expressly delegated by the Legislature, a municipality can impose such regulation only if it possesses implied powers to do so. Any question as to the existence of such implied powers is to be resolved against the municipality. *Valley Deposit and Trust Company of Belle Vernon,* supra.

The Borough lacks express authority for this regulation. Section 1202(17) of the Borough Code, 53 P.S. § 46202,[1] relied upon by the majority, authorizes the Borough to regulate the streets and public ways. This provision permits the Borough to grant cable television franchises and to impose conditions upon the installation, use and maintenance of cable television wires placed beneath municipal streets. It cannot, however, authorize a requirement that National Cable's rates to its subscribers be approved by the Borough, for the requirement is regulation of National Cable's business, not of the use of the streets as contemplated by the Code. See generally *46 South 52nd Street Corporation v. Manlin,* 398 Pa. 304, 157 A.2d 381 (1960) (placement of newsstands on sidewalks).

Similarly, section 1202(74) of the Borough Code, 53 P.S. § 46202,[2] also relied upon by the majority, does not confer upon the Borough express power to enact this ordinance. Section 1202(74), which provides that a municipality may enact ordinances not inconsistent with the laws and the

1. Act of February 1, 1966, P.L. (1965) 1656, No. 581, § 1202, 53 P.S. § 46202: "Among the specific powers of the borough shall be the following: . . . (17) Street and sewer regulations; obstructions. To regulate the streets, sewers, public squares, common grounds, sidewalks, curbs, gutters, culverts and drains, and the heights, grades, widths, slopes and construction thereof; and to prohibit the erection or construction of any building or other obstruction to the convenient use of the same."

2. "General powers. To make and adopt all such ordinances, bylaws, rules and regulations not inconsistent with or restrained by the Constitution and laws of this Commonwealth, as may be expedient or necessary for the proper management, care and control of the borough and its finances, and the maintenance of peace, good government, safety and welfare of the borough and its trade, commerce and manufacturers."

Constitution of the Commonwealth, does not delegate to a municipality powers beyond those expressly authorized by enabling legislation. Such a catch-all provision is insufficient to authorize a municipality to enact an ordinance not specifically authorized by another section of the Code or by other enabling legislation.

In *Washington Arbitration Case*, supra, a statute expressly authorized third class municipalities to pay insurance premiums for city employees, but was silent concerning the power of third class cities to pay such premiums for families of employees. An arbitration award required the city to pay premiums for families of employees. This Court held that the award was not enforceable because the exercise of power called for was unauthorized by enabling legislation, despite the presence of a catch-all provision in the city code, substantively identical to that of the Borough Code. In *Scott v. Philadelphia Parking Authority*, 402 Pa. 151, 166 A.2d 278 (1960), a municipal authority sought to grant public employees tenure by contract. The power to do this was not expressly granted by statute, although a catch-all provision in the enabling legislation allowed the parking authority to make contracts of "every name and nature." This Court invalidated the contract as unauthorized. The same result was reached in *Genkinger v. New Castle*, supra, where a statute was silent as to the power of a third class city to enact an ordinance concerning an employee retirement system. Notwithstanding the catch-all clause of the Third Class City Code, this Court held that the city lacked power to enact such an ordinance.

The facts here present a less compelling case for upholding municipal exercise of power than did the facts of these three cases. In *Washington Arbitration*, supra, the municipality would merely have extended the grant of medical benefits from employees, who were expressly covered by the statute, to the families of those employees. *Scott* involved a contract purportedly made pursuant to a statutory power to make contracts of "every name and nature." In *Genkinger v. New Castle*, supra, the power to adopt an employee

retirement system could easily be deduced from the un-
doubted power to hire and adequately compensate employ-
ees. Here, however, the regulation of rates of a commercial
enterprise is not reasonably deducible from any of the
specific powers granted to the Borough in the Borough
Code. In short, the catch-all clause relied upon by the
Borough cannot authorize a regulation of National Cable's
rates which exceeds the powers specifically granted by the
Borough Code.

That the ordinance cannot be sustained as an exercise of
the police powers is almost too obvious for discussion. No
one doubts that a city must have implied powers to regulate
public ways and to contract for public services. See, e. g.,
*Butler v. Nuth, et al.*, 361 Pa. 484, 65 A.2d 687 (1949)
(contract for garbage collection permissible as necessary for
health of residents); but it cannot reasonably be asserted
that a city, in order to preserve the public health, safety and
welfare, must retain the implied power to approve the
monthly rates charged by a private cable television compa-
ny. "As the exercise of this right does not appear to be
necessary to such municipalities to enable them to perform
that share of the general government entrusted to them,
there would seem to be no reason to imply it." *Valley
Deposit and Trust Company of Belle Vernon*, supra (priority
in bank distributions).

When a municipality lacks statutory authority to enact an
ordinance, it cannot attempt to enlarge its delegated powers
by contract. A contract entered into by a municipality is
valid only if authorized. *O'Malley v. Olyphant Borough*, 198
Pa. 525, 48 A. 483 (1901); cf. *Scott v. Philadelphia Parking
Authority*, supra at 159, 166 A.2d at 283 (municipal authori-
ty). Hence, the Borough cannot rely on contractual princi-
ples to justify its unauthorized ordinance.

*Philadelphia v. Holmes Electric Protective Company of
Philadelphia*, 335 Pa. 273, 6 A.2d 884 (1939) is not to the
contrary. There, the only issue before the Court was inter-
pretation of a provision of an agreement between the City
of Philadelphia and a burglary alarm company. The compa-

ny never questioned the power of the City to enter the agreement. National Cable raises here the issue not involved in *Holmes*, and upon which *Holmes* cannot serve as authority.

In sum, the Borough lacks statutory power, express or implied, to impose upon National Cable a requirement of municipal approval of rate increases. Without statutory authorization, the Borough likewise lacks power to regulate National Cable's rates under a contract theory. Nonetheless, the majority holds that the Borough may impose such a regulation. Perhaps the majority, noting that cable television companies are not currently subject to any form of state or federal rate regulation, seeks to plug the regulatory gap by conferring upon municipalities rate fixing power over the cable television industry. However wise regulation of rates may be as a matter of policy, it should not be imposed by this Court. If cable television rates are to be fixed, authority to do so must properly come not from this Court but from the Legislature of this Commonwealth, or the Congress of the United States.

I dissent.